PHILIP A. RYAN LUMBER CO. v. BALL.
(No. 5481.)

(Court of Civil Appeals of Texas. San Antonio. May 12, 1915. Rehearing Denied June 9, 1915.)

1. LOGS AND LOGGING &ssearrow;3—SALE OF TIMBER—BREACH OF CONTRACT—WAIVER OF PROVISION—QUESTION FOR JURY.

Where, in an action for breach of a contract to sell timber, providing the seller notified the buyer on or before a certain date that he had secured a right of way on which to construct a railroad by which the timber could be transported, the evidence was such that reasonable minds might differ as to whether the time in which the notice was to be given had been waived and the contract continued in force with that provision eliminated, such question was for the jury.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 6–12; Dec. Dig. &ssearrow;3.]

2. BROKERS &ssearrow;38 — DUAL EMPLOYMENT — QUESTION FOR JURY.

Where, in such case, the evidence was conflicting on defendant's contention that plaintiff had secretly employed his agent and paid him a commission, thereby rendering the contract void, such issue was for the jury.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 31–36; Dec. Dig. &ssearrow;38.]

3. PRINCIPAL AND AGENT &ssearrow;14—EXISTENCE OF AGENCY—PAYMENT OF EXPENSES—SALE OF TIMBER.

That the buyer under a contract for the sale of timber, which involved the procurement of a railroad right of way, by the seller, paid the expenses of the seller's agent in getting the right of way, did not make him the buyer's agent.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 26–33; Dec. Dig. &ssearrow; 14.]

4. BROKERS &ssearrow;7—EXISTENCE OF AGENCY—STATEMENT OF OWNER.

Where the owner of timber stated, in response to C.'s request that he submit through him price on the timber, that he would not do so and would give no option, but that if C. found any one who wanted the timber and was able to buy it he would trade on almost any fair proposition, this did not make C. the owner's agent for the sale of the timber.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 5–8; Dec. Dig. &ssearrow;7.]

5. LOGS AND LOGGING &ssearrow;3—SALE OF TIMBER—BREACH OF CONTRACT—WAIVER OF CONDITION—SUBMISSION OF ISSUES.

Where, in an action for breach of a contract to sell timber providing the seller notified the buyer on or before a certain date that he had secured a right of way on which to construct a railroad by which the timber could be transported, the evidence was conflicting on whether the parties by mutual agreement had extended the time for notice and on whether the seller gave such notice, it was error to refuse instructions in which such issues were submitted to the jury.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 6–12; Dec. Dig. &ssearrow;3.]

6. LOGS AND LOGGING &ssearrow;3—SALE OF TIMBER—REPUDIATION OF CONTRACT.

A statement by the buyer that it would expect indemnification against lawsuits affecting a part of the land on which the timber bought was located, and that it was losing money every day waiting for a railroad to be built by the seller, and an inquiry as to how long it would be until the road was completed, did not constitute a repudiation of the contract; a mere intimation that a contract may be repudiated, when unaccepted by the other party, not operating to avoid the contract.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 6–12; Dec. Dig. &ssearrow;3.]

7. CORPORATIONS &ssearrow;642—FOREIGN CORPORATION—DOING BUSINESS IN STATE—TIMBER CONTRACT.

Vernon's Sayles' Ann. Civ. St. 1914, arts. 1314, 1318, requiring that foreign corporations secure permits before doing business within the state, does not prevent a foreign corporation which has not procured a permit from contracting to buy timber located in the state, in contemplation of doing business in the state.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2520–2527; Dec. Dig. &ssearrow;642.]

8. LOGS AND LOGGING &ssearrow;3—SALE OF TIMBER—VALIDITY OF CONTRACT—DESCRIPTION.

A contract for the sale of timber on a "certain tract of land" in a county named, "containing 12,000 to 15,000 acres of timber

---

land east of Trinity river," was not so indefinite in description as to be void, where a map attached to it, as shown by the evidence, accurately and fully defined the boundaries.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 6–12; Dec. Dig. ☞3.]

9. FRAUDS, STATUTE OF ☞72—INTEREST IN LAND—SALE OF GROWING TIMBER.

Where a contract for the sale of growing timber stated that it was not a lease, and that the owner retained absolute control of the land and a railroad to be built over it, giving the buyer a mere right to go on the land and cut and remove the timber, it was a contract for the sale of chattels and not a contract to convey an interest in the land, within the statute of frauds.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 116–118, 146; Dec. Dig. ☞72.]

10. FRAUDS, STATUTE OF ☞49—OPERATION—CONTRACT.

A contract which may or may not be performed within one year does not fall within the statute of frauds.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. § 74; Dec. Dig. ☞49.]

Appeal from District Court, Anderson County; John S. Prince, Judge.

Action by the Philip A. Ryan Lumber Company against P. D. C. Ball. From judgment for defendant on instructed verdict, plaintiff appeals. Reversed and remanded.

R. E. King, of Memphis, Tenn., and Thos. B. Greenwood, of Palestine, for appellant. Lyon & Swarts, of St. Louis, Mo., and Morris & Sims, of Palestine, for appellee.

CARL, J. Appellant, Philip A. Ryan Lumber Company, a Tennessee corporation, sued appellee, P. D. C. Ball, who resides in St. Louis, Mo., to recover $66,500 damages by reason of an alleged breach of contract on part of appellee to sell appellant the timber on 12,000 to 15,000 acres of land on the Trinity river in Anderson and Freestone counties, Tex. An attachment was sued out and levied on appellee's lands, and a foreclosure of the lien thereby created was sought to be procured. The contract was executed in St. Louis, on March 20, 1912, and signed by the lumber company, by Philip A. Ryan, president, and by P. D. C. Ball in proper person. To this contract was attached a map of the land, showing also the proposed route of the railway to be constructed. The portions of that contract necessary to a discussion of the issues in this case are as follows:

"The vendor agrees to use his best efforts to obtain a right of way for a railroad from the southern terminus of the proposed railroad on the vendor's land, shown on the map hereto attached, to the north end of what is known as the 'Salt Works Spur' on the International & Great Northern Railway, a distance of approximately six (6) miles, together with a connection with said railway at said Salt Works Spur, by which the lumber cut and carried from the said vendor's land may be transported to and conveyed over the International & Great Northern Railroad. It is understood and agreed that the obligations of the vendor and purchaser herein assumed shall only be imposed upon them respectively in the event that said vendor notifies the purchaser on or before the 15th day of April, 1912, that he has secured said right of way and connection.

"Immediately upon giving said notice to the purchaser, the vendor agrees with all reasonable diligence to commence the construction of a railroad at said north end of said Salt Works Spur and continue the construction of said railroad to the south terminus of the proposed road on the vendor's land shown on the plat hereto attached, and from then on under the terms hereof continue the construction of said road as indicated on said plat.

"It is understood and agreed that the line of the proposed railroad shown on the map hereto attached is not absolute, but is intended, so far as it can, to indicate the line of the proposed road, it being understood that the vendor in building said road through his land shall have the right to divert the line of construction so as to avoid swamps or other places involving difficulties or large expense of construction.

"It is understood that the vendor in building said railroad through his land shall be under obligation only to build said railroad from time to time a distance of one (1) mile ahead of the timber from time to time being cut by the purchaser.

"It is understood and agreed that the railroad shall be constructed at the expense of the vendor, shall be of standard gauge, using a rail of not less than fifty-six (56) pounds, and shall be built in the manner adapted to the purpose of this contract. * * *

"The purchaser hereby agrees to cut, during each year of the term of this contract, not less than ten million (10,000,000) feet, log scale, per year, and shall pay the vendor therefor at the rate of two dollars ($2.00) per thousand feet, log scale, for all oak and ash timber cut, and one dollar ($1.00) per thousand feet, log scale, for all cottonwood and elm timber cut. The vendor agrees to cut all oak, ash, cottonwood and elm timber on said land which is ten (10) inches or more in diameter, sixteen (16) feet from the stump. The vendor (purchaser) has no right to cut any timber other than that just herein enumerated and described.

"The obligation of the purchaser to pay for such timber is in no way conditioned upon the purchaser's removal of the same, but the obligation attaches as soon as and when the timber is cut.

"The obligation of the purchaser to cut the timber shall begin as soon as the vendor has constructed a mile of said railroad within the vendor's land; and the purchaser's obligation to cut the amount of timber herein agreed upon shall only begin to run from said time. Provided, however, and it is understood, that the purchaser may, at his option, commence to cut timber prior to such time, in which event, the obligation shall begin to run from said time."

The road was to remain Ball's property; but, by the contract, the lumber company was given the right to use same, furnishing its own equipment, and also to have right of ingress and egress to and from and over the land for the purpose of cutting, milling, and shipping the lumber from the timber, and appellee was to be relieved from liability for accidents by reason of appellant operating the railroad. In the paragraph describing the kind of timber to be cut, the word, "vendor" was written for "purchaser."

The petition charges that on April 11, 1912, and on April 15, 1912, the plaintiff and defendant, by mutual consent, agreed to aban-

don, renounce, and relinquish the clause and term of the written contract to the effect that the obligations thereby assumed and created should be imposed upon the parties respectively only in the event that the defendant notified plaintiff before April 15, 1912, that he had secured the right of way for said railroad from the Salt Works Spur to defendant's land, and a connection at said spur, with the International & Great Northern Railroad, and that thereupon both parties became bound by their respective obligations under the contract according to its terms, with said waived clause eliminated. It is also pleaded that on said dates the defendant agreed with plaintiff in writing to waive said clause. And it is further pleaded that on or about May 28, 1912, and May 30, 1912, the defendant did secure such right of way from said Salt Works Spur to the southern terminus of the proposed railroad, together with connection with the International & Great Northern Railroad, and on or about said dates the defendant notified and advised the plaintiff that he had secured said right of way and railroad connection. It is alleged that the time to secure said right of way and railway connection had been, by mutual consent, extended to May 28th, May 29th, and May 30th, and even until July 6, 1912.

The defendant pleaded in abatement of the suit the fact that the plaintiff was a foreign corporation and had not secured a permit to do business in Texas, which the court overruled, as well as special exception to the same effect, and one invoking the statutes of frauds. And an exception, No. 15, was sustained against plaintiff's right to recover $5,000 paid one Craig by plaintiff as commissions. Defendant joined issue on the material allegations, and specially pleaded that plaintiff had employed Craig, who was defendant's agent and paid him $5,000 commission; that defendant was in ignorance of the fact that Craig was so acting as plaintiff's agent also at the time the contract was entered into; and that therefore said contract was null and void.

In its replication, plaintiff denied that it had repudiated the contract or refused to go forward with same; and denied any collusion with Craig, and set out that Craig, who was highly recommended to the company, represented that he and appellee had up a colonization scheme by which they were to sell out and colonize about 52,000 acres of lands belonging to appellee, for a commission which would amount to several dollars per acre, and that Ball would have to sell the timber before the land could be colonized, and that Ball would pay no commission for selling the timber. Therefore Craig represented that whoever bought the timber would have to pay the commission, and thereupon appellant agreed to pay the commission of $5,000 in the event of the purchase by appellant of such timber, and that plaintiff had no knowledge that defendant was not fully advised as to the agreement between appellant and Craig as to the commission,' and that, after full knowledge concerning the commission arrangement, defendant ratified and acquiesced in the contract of sale of the timber. It was also pleaded that the defendant made the contract for himself in person and not by an agent, and that, regardless of any action of Craig's, same was a binding contract on defendant's part.

A jury was impaneled to try the cause; but, after the plaintiff had closed, the court instructed a verdict for the defendant, and the lumber company has appealed. So it becomes necessary that we inquire as to whether there was evidence about which reasonable minds might differ on the question as to waiver of the time limit on notice to be given provided in the contract.

[1] The evidence upon which the appellant relies, as showing an extension of the contract and modification by agreement as to the time in which notice was to be given that the railway right of way and connection had been secured as provided in the contract, consists largely of letters and telegrams passing between Philip A. Ryan, president of the lumber company, and appellee Ball; and between Craig, the agent, and Hall, the representative, of P. D. C. Ball at Palestine, Tex.

E. H. Craig, of Columbus, Ohio, sent out a letter on February 21, 1912, to Philip A. Ryan Lumber Company, among others, calling attention to the timber lands of appellee in Texas. On February 19, 1912, two days prior to sending out said letter, Craig addressed a communication to appellee Ball inquiring as to whether he would care to submit prospective purchasers "a price on this timber, through me," and Ball replied thereto, on February 22, 1912, as follows:

"When you find anybody that really wants the timber and has the money or credit to buy it, I will trade on almost any fair proposition. I will not, however, give any one an option on the land or timber. I am so exceedingly busy at present on the Little Rock work, that have not much time to think of this matter. Suggest that you line up your lumbermen and any people that you think want to buy Texas land and when you get everything in shape, come over and present what you have to offer. I will be ready to do business on any reasonable basis."

As a result of much other correspondence, and personal inspection of the timber by Ryan and his timber expert, Lewis, the contract, a part of which is set out above, was made. The attorney for the lumber company at Memphis drew a contract which Ryan took with him when he went to St. Louis to close with Ball. The form prepared, however, did not meet Ball's approval, and he had his own attorney draw the one which was signed by Ball in person and by Ryan for the lumber company, and a $500 earnest part payment check was delivered to Ball.

Subsequent to the signing of the contract, on account of floods, and some difficulty in

obtaining the right of way for the railway and connection with the International & Great Northern Railroad, it was seen that Ball would not be able to get the right of way and connection by the 15th of April. Thereupon began the correspondence and interviews which it is alleged resulted in a waiver of that provision of the contract relative to the notice that the right of way was obtained by April 15th. There were a number of letters and telegrams passing among the various parties, but we give here only those bearing immediately upon what it is contended show a waiver of the time for notice as to the right of way.

On April 4, 1912, in answer to appellant, Ball stated that he was sorry he had been able to do little or nothing towards getting the railroad from the salt mines to the timber; that he and Freeman, receiver of the International & Great Northern Railway Company, had failed to get together; that continuous rains had interfered with securing a right of way, but promised to keep working on it to the best of his ability.

On the same day, Ball wrote to Hall, his agent at Palestine, and, among other things, said:

"Mr. Ryan is getting anxious, but it cannot be helped. Can't do much with high water. So he will have to wait or cancel his contract."

On April 8, 1912, Mr. Ryan wrote Mr. Ball, saying:

"What I am most anxious to know is that you have secured the right of way from the salt mines into the timber. * * * Secure the right of way and wire me you have secured it, then I know what to do and can make my plans to move to Texas. * * * The weather and water may delay your building the road but this will be O. K., as I know if right of way is secured the road is assured, within a reasonable time."

And on April 11, 1912, Ball wrote to Craig that Mr. Ryan could suit himself about getting out of the deal; that there would be no way to get the road in before April 15th, and, "if Mr. Ryan does not want to extend his contract, he will have to get off; and considering, additionally to your expenses, I had to pay that lawyer $100.00, you can see that I am not particular about losing it, but no use going into an expenditure on the R. R. until I know where I am at."

On April 11, 1912, Ball, in reply to Ryan's letter of April 8th, said:

"I have your favor of the 8th inst. upon my return home. Also a letter from Mr. Hall and President Freeman of the I. & G. N., who is in New York. Mr. Freeman states that owing to the flooded condition of the country and their many troubles at Memphis and south, he will not be able to see me until next week, if then. A letter from Mr. Hall states that the roads have been impassable, so much rain that the surveyors have not been able to locate a satisfactory line and he has been able to do little or nothing. A letter from Mr. Craig tells me to hurry up, etc.

"The facts are that I propose to try and get this railroad run into this timber but there is no use trying to do it until it can be done and as I will have some twenty miles of road to build, possibly thirty, if it only costs $5,000.00 a mile, will take all the receipts from the timber to build same; consequently I do not wish to have it cost any more than necessary. I will get at it just as soon as the weather conditions are such that it can be done at a reasonable expense and the whole 'meat of the cocoanut' is the consent of Mr. Freeman, president of the I. & G. N., to a connection with his road for handling the stuff, so he primarily controls the situation and under the present circumstances, I have been able to do nothing with him although I have several nice letters and telegrams stating he is sorry, etc. Have started for New Orleans twice to be telegraphed not to go owing to his leaving.

"Very sorry to hear that the high water has been so bad in your vicinity and sincerely hope you have not lost any timber or property owing to the floods. It now begins to look like the worst of it is over and everything will be dried out in the course of the next six weeks unless the usual June rise comes in early on top of this rise, in which case am afraid it will be very severe. Hoping you will have enough patience to sit tight and wait until I can accomplish some results, I remain,

"Yours very truly, P. D. C. Ball."

On April 15th, Craig wrote to Ball that he was advising Mr. Ryan that the only thing he could do "was to wait until you have time to 'do things.'"

One of the main letters, dated April 15, 1912, in which it is contended that Ryan granted the waiver and extension of time asked in Mr. Ball's letter of April 11th, is as follows:

"Mr. P. D. C. Ball, St. Louis, Mo.—Dear Sir: Your favor of the 11th just received. We have carefully noted all you say, and we know that the conditions are very bad now on account of the flood, consequently we have decided to take on a new consignment of patience and sit tight in the boat and wait until the conditions are normal again, and then we feel sure that you will jump into the fight and get results immediately. Had the conditions been normal we would have hollered to beat the band, but no one ever expected the great flood that we have had, and we think in 10 days the conditions will be such that we can get over the ground and everything will be back to the normal condition.

"Please let me know just as soon as you can, as we know you understand what it is to be in my position. We have a great many things to do just as soon as we have the word from you that the right of way is secured. We trust that you will have Mr. Hall work on the right of way and secure same and the surveys run as quickly as possible, as it will take a lot of hustling on our part to get the equipment ready while you are completing the road. We hope you will be able to catch Mr. Freeman very soon as he no doubt will be on his line pretty regularly now. We hope to hear from you very soon with a favorable report.

"Very truly yours,

"Philip A. Ryan Lumber Co."

This correspondence continued, and Ryan at all times urged the pushing of the right of way matter. Ryan says that about May 12, 1912, appellee agreed to pay Craig's expenses and the hotel bills of Ryan to get them to go down to Texas and assist Hall in obtaining the right of way, and this was done. In none of these letters does Ball repudiate the contract, or do other than show a desire to go forward and treat the contract as being still in force. It is true that in some he says that Ryan can suit himself

about getting out of the deal. His agent, Hall, kept Ball informed as to the progress being made on the right of way, and on May 27th wrote Ball that he had secured the right of way, except one man who had a nine-acre strip they would cross. Ball acknowledged this as a "satisfactory letter," and suggested that Hall take options on contiguous lands so that "we might make a little money on the side." On May 28th, Ball wired Ryan:

"Hall writes has secured right of way. You can see me St. Louis Thursday and Friday, if desire. Craig here."

On receipt of this telegram, Ryan went to St. Louis, arriving there on the 30th of May, or 31st. He says Craig was there.

"I saw Ball. Mr. Craig was there. I saw them together at Mr. Ball's office. We saw Mr. Ball, and he said he had secured the right of way and was going to make arrangements to build the railroad right away and I would get the timber. He also stated, during our trip in St. Louis, that he had written Mr. Grogan for ties, to make ties, and he had negotiations out for rails, and there was absolutely nothing to hinder building the railroad and my getting the timber, and that I could go home and feel absolutely sure that I would get the timber, and could soon move down to Texas and start to cutting the timber. After the conversation I mentioned was had with Mr. Ball in St. Louis, I paid Mr. Craig this commission," etc.

Considering these letters and telegrams, together with others not set out here, and the oral testimony given upon the trial, we think that undoubtedly the evidence is of such a nature that reasonable minds might honestly differ as to the waiver of the time in which notice was ·to be given and as to whether it was the intention of the parties to continue the contract in force, that clause eliminated. This being true, the jury should have been permitted to pass upon the case.

[2, 3] The matter of whether Craig was Ball's agent or a middleman should have gone to the jury. Ball had denied that he was such agent, while some of the evidence tended to show that he was such agent. It is contended by appellee that the time Ball had reference to, when he said Craig was not his agent, was subsequent to the time the contract is claimed to have expired; but appellant just as vigorously asserts that Ball had reference to the time leading up to the alleged breach of the contract. This of itself was sufficient to take that question to the jury. Nor is it conclusive as to Craig's agency that Ball paid his expenses to Texas to assist Hall in getting the right of way. It will be recalled that he also paid part of Ryan's expenses on the same trip and to assist in the same work Craig came here to do. And yet would it be contended that Ryan was Ball's agent? He might be in obtaining the right of way, but it would scarcely be asserted that either was agent in any other capacity by reason of that fact. It not infrequently happens, as is known of all men, that a man will pay another's expenses to get him to look at property he proposes to sell that man, as an inducement to make the sale. Possibly the prospective purchaser would not otherwise care to go to the expense of inspection. And yet that would not make him the agent of the owner in any sense of the word.

These questions should have been left to the jury, as well as the further question as to whether Craig was a middleman.

[4] It is doubtful if there is any evidence to show Craig to have been ·Ball's agent for the sale of the timber, for he had refused to even give Craig a price or to place the property with him. All he would do was to tell Craig to get his purchaser and bring him to him, and he (Ball) would consider the proposition with him. He never gave Craig any authority whatsoever to bind him in any respect. He was not even quoied a price. If Craig had sued Ball for a commission on this timber sale, could he not properly have answered that he had never made him his agent, had given him no right to sell the property or to quote any price, ·but, on the contrary, had told him to bring his purchasers to him, when he would deal for himself? The mere fact that Craig and Ball had an arrangement for· the colonization of the land after the timber should be removed did not of itself clothe Craig with the powers of agency in regard to the sale of the timber. If these facts would constitute agency, then every man who submits an offer for property, even without any intimation that he was to become such, could, with equal propriety, assert that he was the agent of the seller and claim a commission for the sale if the owner saw fit to accept .such proposition. This is probably what Ball was guarding against, for he says, in substance: Get your parties and bring them to me. I will do business with them if we can arrange terms. This kind of proposition is open to the world, but I will make my own terms and act for myself. So far as the written evidence is concerned, no agency whatsoever in regard to the sale of the timber is shown; but, in view of the oral testimony given, we have thought that that question should have been submitted to the jury.

Touching on the question of the employment of agents, Chief Justice Gaines said, in Dunn v. Price, 87 Tex. 321, 28 S. W. 682:

"There was no express promise to pay anything in this case, nor do we think that one can be clearly implied from the language used. If one requests another to perform a service for him, the law will ordinarily imply a promise to compensate him for the work. But, when one having property to sell tells a broker that if he will bring him a purchaser he will sell at a certain price, it is by no meáns certain that he intends to imply a promise to pay a commission. The broker may get his compensation from the purchaser. In this case the defendant did not authorize the plaintiff to sell his property, nor did ·he employ him to sell it. He merely said to him, in effect, that if he would bring him a purchaser he would show him that he would sell for the sum of $30,000. Can it be said that it is clear that the defendant did not expect him to get his compensation from

the purchaser whom he might procure? That such was his intention (if indeed his language was anything more than mere idle banter) is shown by the fact that his language was that he would take $30,000 for the property, and that there is not an expression in it to indicate that he was willing to take that sum less a commission for selling. This conclusion is strengthened by the further fact that he had previously declined to employ the plaintiff to make the sale."

And in Pipkin v. Horne, 68 S. W. 1000, it is said:

"A real estate agent is entitled to commissions only when he brings the parties together by virtue of a contract made with him by one or both of the parties, by virtue of which they become liable to him by reason of some express or implied promise to pay commissions. Simply bringing the parties together, in the absence of some contract by which they would be liable to him, does not necessarily make them liable to him for commissions."

Speaking of a dual agency, the court said, in T. A. Hill & Son v. Patton & Schwartz, 160 S. W. 1157:

"The above principle of law is applicable only to cases of agency in which the agent is clothed with some discretion in the matter of advising or negotiating, in fixing or agreeing to the price, or has the power to bind his principal by contract in reference to the property in question. It is not true that every ordinary real estate broker with whom land is listed for sale occupies the position of trust and confidence, upon whom rests the duty to obtain the highest price obtainable for his principal's land."

This case cites many authorities as sustaining the doctrine announced.

Bear in mind that Craig had asked Ball to submit "a price on this timber, through me." This Ball declined to do, saying:

"When you find anybody that really wants the timber and has the money or credit to buy it, I will trade on almost any fair proposition. I will not, however, give any one an option on the land or timber."

[5] The court should have given plaintiff's requested charges Nos. 1 and 2 and No. 2a. The first two charges are as follows:

"No. 1. Do you find, from the preponderance of the evidence, that plaintiff and defendant mutually agreed that the time for notice by defendant to plaintiff that the defendant had secured the railroad right of way and connection was extended until May 30, 1912?

"No. 2. Do you find from the preponderance of the evidence that on or about May 28, 1912, the defendant notified plaintiff that he had secured the railroad right of way and connection?"

No. 2a was the same as No. 2, except that May 30th was substituted instead of May 28th.

[6] If the contract was closed, as amended May 28th or May 30th, then the evidence is insufficient to show that plaintiff subsequently repudiated the same, or to take that question to the jury. A mere intimation that it might be repudiated, unaccepted by the other party, would not avoid the contract. The letter appellant wrote appellee on June 11, 1912, does not repudiate the contract, but merely states that the company would expect indemnification against some lawsuits pertaining to a part of the land before erecting the mills; and the next day wrote appellee that it was losing money every day, waiting for the road to be built, and asking how long it would be until it would be completed. In all their subsequent correspondence by letter and by wire during June, no repudiation by either party is shown; but, on the contrary, both sides indicate a desire to go forward with the matter. We do not think this was a question for the jury, and the seventh assignment is overruled.

It follows from what has been said that the amount of damages should have been submitted to the jury, and also as to whether the defendant refused to commence and continue the construction of the railroad with reasonable diligence.

[7] The appellee has filed cross-assignments, the first four of which raise in different forms the question that the plaintiff below is a foreign corporation and had not obtained a permit to do business in Texas at the time of this transaction. This was raised by plea of privilege, plea in abatement, by plea in bar of the right of recovery after the evidence was all in and the court withdrew the matter from the jury and overruled said pleas, and lastly in overruling a special exception to the same effect. This contract was not made in Texas, neither party lived in this state, and the breach of the contract, if there was one, on part of the defendant, put it out of the power of the appellant even to do business here in so far as that particular proposition is concerned. It is not unlawful for a foreign corporation to contract in regard to buying property in Texas, in contemplation of doing business in this state; for, if such preliminary matters as are necessary to begin any large business could not be the subject of a contract by a foreign corporation, such as arrangement for building sites, etc., it could not place itself in a position to know whether it could do business here. The purpose of this corporation was to cut the timber, manufacture and sell the lumber. So the contract for the purchase of the timber was not carrying on the proposed business. It is true that it would have to obtain a permit before it could carry on that business; but the risk of obtaining a permit was one it had the right to assume when it made the contract. It had the right to assume that, if it complied with our laws and applied for a permit when it got ready to do business, that permit would be granted because the purpose was a lawful one. It had not at that time done any business in Texas, and it had a right to make the contract it is alleged was made. Articles 1314, 1318, Vernon's Sayles' Texas Civil Statutes; Security Co. v. National Bank, 93 Tex. 579 to 582, 57 S. W. 22; Lake View Co. v. S. A. Traction Co., 95 Tex. 258, 66 S. W. 766; Jackson Woolen Mills v. Moore, 154 S. W. 644; Western Supply Co. v. Trust Co., 41 Tex. Civ. App. 485, 92 S. W.

986; Whitley v. Electric Co., 18 Tex. Civ. App. 674, 45 S. W. 959; Hogan v. City of St. Louis, 176 Mo. 149, 75 S. W. 604 to 606; Diamond Glue Co. v. U. S. Glue Co., 187 U. S. 612 to 615, 23 Sup. Ct. 206, 47 L. Ed. 328; 19 Cyc. 1271; Land & Mortgage Co. v. Worsham, 76 Tex. 559, 13 S. W. 384; Kingman Texas Imp. Co. v. Borders, 156 S. W. 617; A. Leschen & Sons Rope Co. v. Moser, 159 S. W. 1025; Skidmore Drug Co. v. American Mfg. Co., 170 S. W. 128. These assignments are overruled.

[8] The fifth cross-assignment asserts that the contract involved an interest in the land and the description was so indefinite and uncertain as to render such description void.

In addition to what we have set out of the contract, the first paragraph of that instrument reads:

"Whereas, P. D. C. Ball, of the city of St. Louis, Mo., hereinafter called vendor, is the owner of a certain tract of land in Anderson county, Tex., containing twelve thousand to fifteen thousand acres of timber land east of Trinity river, and desires to sell the timber hereinafter described and on said land under the terms hereinafter described and on said land under the terms hereinafter provided."

The plaintiffs set out a full description which the evidence shows coincides with the outline given by the map attached to the contract, and accurately defined the boundaries. The map referred to shows who made it and gives a scale. It also shows to whom the land belonged and where he lived. It shows public roads, the river, creeks, etc., as well as the line of the proposed railroad. Our courts have repeatedly held that that is sufficiently certain which can be made certain from facts furnished. The main question is as to whether there is sufficient basis for identification, and not that the utmost certainty should exist. Wethered v. Boon, 17 Tex. 143; Hines v. Perry, 25 Tex. 443; Traylor v. Townsend, 61 Tex. 144; Skov v. Coffin, 137 S. W. 450; Beaton v. Fussell, 166 S. W. 458, and cases cited; Spaulding v. Smith, 169 S. W. 629; Macmanus v. Orkney, 91 Tex. 33, 40 S. W. 715; M., K. & T. Ry. Co. v. Carter, 95 Tex. 476, 68 S. W. 159; Hermann v. Likens, 90 Tex. 455, 39 S. W. 282; Porter v. Memphis Land Co., 159 S. W. 498; Morrison v. Dailey (Sup.) 6 S. W. 427; Watson v. Baker, 71 Tex. 739, 9 S. W. 867. The assignment is overruled.

[9, 10] It has been held repeatedly in this state that a sale of growing timber, which the contract contemplates is to be cut and taken away within a certain time or a reasonable time, is a sale of chattels and does not convey an interest in the land. This contract shows upon its face that no interest in the land is conveyed. It expressly states that it is not a lease and the owner retains absolute control of the land and the railroad to be built, only giving appellant the right to go there to cut and remove the timber. And a contract which may or may not be performed within one year does not fall within the statute of frauds. Davis v. Conn., 80 Tex. 276, 16 S. W. 39 to 42; Houston Oil Co. v. Boykin, 153 S. W. 1176; Carter v. Clark & Boice Lbr. Co., 149 S. W. 278; North Texas Lumber Co. v. McWhorter, 156 S. W. 1152; Montgomery County Devel. Co. v. Miller-Vidor Lumber Co., 139 S. W. 1015; Thouvenin v. Lea, 26 Tex. 615; City of Tyler v. Railway, 99 Tex. 497, 91 S. W. 1, 13 Ann. Cas. 911.

The judgment of the trial court is reversed, and the cause is remanded for new trial.