[Civil No. 1460.  Filed March 25, 1916.]

[156 Pac. 87.]

JOHN H. MARTIN, Trustee in Bankruptcy of the IMPERIAL COPPER COMPANY, a Corporation, Bankrupt, Appellant, v. BANKERS' TRUST COMPANY, a Corporation, Appellee.

1. BANKRUPTCY—JURISDICTION—BANKRUPTCY AND STATE COURTS.—The jurisdiction of a state court to foreclose a mortgage is not divested by subsequent proceedings in bankruptcy in which the bankruptcy court directs the trustee in bankruptcy to make application to intervene in the foreclosure proceeding.

2. CORPORATIONS—FOREIGN CORPORATIONS—"CARRYING ON BUSINESS."— The prosecution of a suit in the state is not "carrying on business" within Civil Code of 1901, paragraphs 909, 911, forbidding a corporation to carry on any business, enterprise or occupation in the

state until it has filed a certified copy of its articles of incorporation or charter and the appointment of an agent, and has made publication of its articles of incorporation and proof thereof.

3. CORPORATIONS—FOREIGN CORPORATIONS.—A foreign trust company in accepting a trust and executing in New York the trust deed on land in Arizona, does not violate any law of Arizona.

4. CORPORATIONS—FOREIGN CORPORATIONS—"CARRYING ON BUSINESS."— A single transaction does not constitute "carrying on business" within Civil Code of 1901, paragraphs 909, 911, forbidding foreign corporations to carry on business in the state except on compliance with certain requisites.

5. CORPORATIONS—PARTIES—DEFECTS AND OBJECTIONS—SUBSTITUTION.— In an action by a foreign corporation as trustee to foreclose a deed of trust, bondholders secured by the deed of trust being the real parties in interest, even if the plaintiff were disqualified to act for failure to comply with the requirements relating to foreign corporations, the bondholders would be substituted as plaintiffs and judgment entered according to their rights.

6. CORPORATIONS — BONDS — CONSTRUCTION — PROPERTY SUBJECT.—That special contract bonds provide for a retirement fund and an interest fund from the surplus earnings of the grantor in the deed of trust does not make the bonds a nullity where there is a further provision that on default the bonds are enforceable against the entire mortgage property through a foreclosure suit, the appointment of a receiver, and a sale of the property.

7. CORPORATIONS — PLEDGE OF STOCK — CONSIDERATION.—A pre-existing indebtedness is a sufficient consideration to sustain an assignment of corporate stock as security.

8. CHATTEL MORTGAGES — RECORD—NECESSITY AS BETWEEN ORIGINAL PARTIES.—A chattel mortgage, even if not recorded, is valid and binding between the parties.

9. BANKRUPTCY—LIENS—RECORD—TRUSTEE IN BANKRUPTCY.—Where an assignment of corporate stock as collateral security was executed prior to the amendment of June 25, 1910 (Act June 25, 1910, c. 412, 36 Stat. 838), to the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 544), whether the instrument be regarded as a chattel mortgage or other lien, even though it be void as to creditors for want of recordation, the trustee in bankruptcy is bound by it as the bankrupt was.

10. CORPORATIONS—PLEDGES—DISTINCTION FROM CHATTEL MORTGAGES— ASSIGNMENT OF CORPORATE STOCK.—An assignment of corporate stock as collateral security, though transferring title to the stock, is a pledge and not a chattel mortgage.

11. PLEDGES—REQUISITES—DELIVERY.—The transfer of title of incorporeal property is generally an essential part of the delivery of it

in pledge, and if there is a doubt whether it is a pledge or a mortgage, the law favors the conclusion that it is a pledge.

12. CORPORATIONS—TRUST DEED—CONSTRUCTION—PROPERTY COVERED.—A deed of trust by a mining company of all its property of every kind, real, personal and mixed, is not restricted to property used in connection with the mines, smelter or railroad of the grantor.

13. CORPORATIONS — PLEDGE OF STOCK — FORECLOSURE — SALE.—On the foreclosure of a pledge of shares of stock of a smelting company and a railroad company, there was no error in the sale of the shares of the two companies together where the court found it would be for the best interests of all parties.

14. APPEAL AND ERROR—RECORD—ABSTRACT.—It is the duty of an appellant to furnish the supreme court with an abstract which fairly represents all portions of the record bearing upon the appeal, and not merely those portions favorable to appellant.

15. APPEAL AND ERROR — REVIEW—PRESUMPTIONS.—On appeal to the supreme court, it is presumed that the judgment of the lower court is correct, and to overcome this presumption the error must be specified and the specification accompanied with an abstract of all that portion of the record which actuated the decision of the particular point.

16. APPEAL AND ERROR—RECORD—ABSTRACT—QUESTIONS PRESENTED.— Unless an appellant presents an abstract fairly informing the court of the errors relied on, abstracting such portions as are necessary to a determination without investigating the original record, and the appellee does not supply the deficiencies, but shows the default of appellant, the assignment of errors to that extent must be disregarded.

[As to what constitutes doing business in state by foreign corporation, see notes in Ann. Cas. 1912A, 553; Ann. Cas. 1913E, 1154.]

APPEAL from a judgment of the Superior Court of the County of Pima.   William F. Cooper, Judge.   Affirmed.

Mr. Francis M. Hartman and Mr. E. F. Jones, for Appellant.

Messrs. Ellinwood & Ross and Mr. Clifton Mathews, for Appellee.

FRANKLIN, J.—This is an action to foreclose a deed of trust covering the property of the Imperial Copper Company, an Arizona corporation, given to secure certain special

contract mortgage bonds of the copper company together with interest, costs and expense, as provided in the mortgage, and also to foreclose the lien of a delivery in pledge of certain shares of stock of the Arizona Southern Railroad Company and the Southern Arizona Smelting Company owned by the copper company, which delivery in pledge was accompanied with a contemporaneous paper, to wit, an instrument of assignment qualifying and explaining the transfer and delivery of the stock, as collateral security for the payment of the bonds. The copper company is the defendant in the suit below, and the amount involved approximates $2,500,000.

The suit was commenced July 3, 1911, and in accordance with the allegations of plaintiff's bill (the plaintiff being the appellee here) and a confession thereof by defendant, a receiver was appointed, who took possession of all of the property described. The evidence is not in the record. From a judgment decreeing a foreclosure and sale, this appeal is prosecuted.

There are ten assignments of error, which are rather more technical than substantial in their nature. By this we mean that the errors alleged for a reversal of the judgment do not go to the merits of the case. Each assignment will be noticed in the progress of the opinion.

Objection is made to the jurisdiction of the court on account of bankruptcy proceedings. There is no suggestion in the record that the bankruptcy court thought there was any equity in the property for the benefit of the general creditors. The bankruptcy court is not seeking to enforce its power and authority, whatever it may be. The state court has never been asked to surrender the property, nor has the bankruptcy court indicated that it would be willing to take possession thereof. It is the appellant who is seeking to enforce an alleged jurisdiction of a court which that court has abstained from seeking to enforce. The court in bankruptcy did, however, recognize the jurisdiction of the superior court by making an order directing its trustee to make an application to intervene in the foreclosure proceeding, which the trustee did and was allowed to become a party in intervention by the superior court. The liens in suit were acquired many years before the proceedings in bankruptcy, and the

foreclosure suit was pending when such proceedings were commenced. The liens sought to be foreclosed are nowhere in the acts of Congress relating to bankruptcy denounced, but, on the other hand, preserved and protected. In other words, they do not belong to those classes of liens expressly declared by the bankruptcy act to be dissolved by an adjudication within four months after they attached, nor to cases of fraud, or attempted preference; but come within the rule that the trustee in bankruptcy takes the property of the bankrupt subject to all such valid and existing liens as would be enforceable against it in the hands of the bankrupt itself. The jurisdiction of the state court to enforce the liens was not divested by the subsequent proceedings in bankruptcy. The case of *The Tube City Mining & Milling Co.* v. *Otterson,* 16 Ariz. 305, 146 Pac. 203, is not distinguished by appellant, nor is the reasoning therein criticised. We are satisfied that case is directly in point and should not be overruled. Indeed, the appellee fortifies it with an abundance of additional authority, there seeming to be no conflict of opinion on the question here presented. It is clear the superior court had jurisdiction.

The plaintiff and appellee is a foreign corporation, but has not complied with the statutes of Arizona relating to foreign corporations "which shall carry on any business, enterprise or occupation in this state." It is contended, therefore, that it was disqualified to act as trustee in connection with the mortgage sought to be foreclosed, and cannot, therefore, maintain this action. Ordinarily an intervener must take the suit as he finds it, and is not in a position to interpose dilatory pleas or plead exceptions going to a dismissal of the suit. *Kenner's Syndicate* v. *Holliday,* 19 La. 154; *Cahn* v. *Ford,* 42 La. Ann. 965, 8 South. 477; *Charleston etc. Ry. Co.* v. *Pope,* 122 Ga. 577, 50 S. E. 374; *Seaboard Air Line Ry.* v. *Knickerbocker Trust Co.,* 125 Ga. 463, 54 S. E. 138; *Booth* v. *State,* 131 Ga. 750, 63 S. E. 502. But, waiving the question whether the present intervener is in a different situation and has such power by reason of being a trustee in bankruptcy, and also, if he has such power, whether the question has properly been raised, there is no merit in the contention. There must of necessity be a great diversity and conflict of

opinion on this subject, owing to the marked differences in the statutory provisions of the several states.

The court below made the following findings of fact, to wit:

"Plaintiff has not at any time complied with any of the statutes of Arizona applicable to foreign corporations desiring to transact business therein, either by filing, recording or publishing its articles of incorporation, or by the appointment of any resident statutory agent upon whom process might be served.

"Except by filing and prosecuting this action, plaintiff herein has transacted no business within the territory or state of Arizona. The trust deed herein foreclosed was accepted, executed and acknowledged by plaintiff in the city of New York, and thereafter recorded by defendant in Arizona, said trust deed having been executed and acknowledged by defendant within the territory of Arizona. At or before the filing of this action, plaintiff had not accepted any other trusts in relation to property situated in Arizona. Except in connection with the prosecution of this action, it has never had an agent or representative in Arizona, nor has it maintained any office or place of business therein. The certificates of stock described in the supplemental agreement were delivered to and received by plaintiff at its office and place of business in the city of New York, state of New York, in which city and state defendant also maintains an office.

"All acts performed by plaintiff in connection with the mortgage herein sought to be foreclosed were performed at the city of New York. After the filing of this action and at its said office in New York, plaintiff accepted appointment as trustee under three other trust deeds or mortgages of real estate situate in Arizona, in two of which it continues to act as such trustee. It has not transacted any business or done any act in reference to any of said trusts within the state of Arizona."

The Revised Statutes of Arizona of 1901 provide:

"909. (Sec. 149.) Any company incorporated under the laws of any other state, territory or foreign country which shall carry on any business, enterprise or occupation in this territory shall, before entering upon, doing or transacting such business, enterprise or occupation in this territory, file a certified and duly authenticated copy of its articles of in-

corporation or charter and the appointment of an agent as hereinafter specified with the secretary of the territory and the county recorder in each county in this territory in which such business, enterprise or occupation is to be carried on, and shall publish at least six times in some newspaper published in each of the counties in this territory in which such business, enterprise or occupation is to be carried on, a copy of its articles of incorporation, and upon the expiration thereof, file an affidavit in the office of the secretary of the territory stating that such publication has been made according to law. This section, however, shall not apply to insurance corporations."

"911. (Sec. 151.) No corporation such as is mentioned in section 149 of this title shall transact any business whatsoever in this territory until and unless it shall have first filed its articles of incorporation and appointment of an agent as required in the two preceding sections, and every act done by it prior to the filing thereof shall be utterly void."

All of the acts of every foreign corporation, whether it carry on a business in Arizona or elsewhere, are not denounced by the law, but "no corporation such as is mentioned in section 149 of this title shall transact any business whatsoever in this territory (state)" until it has done certain things enumerated in the statute. And not every act done by any foreign corporation prior to doing the things required by the law of Arizona is void, but every act done by a foreign corporation *such as is mentioned in paragraph 909, supra, which shall transact any business whatsoever in this territory (state)* is the wording of the law. The corporations referred to are plainly restricted to "any company incorporated under the laws of any other state, territory or foreign country *which shall carry on any business, enterprise or occupation in this territory (state)*."

In order to invoke the provisions of said paragraph 911, it is clear that it must first be shown that the corporation sought to be disqualified is one carrying on a business, enterprise, or occupation in this state. In the face of the finding of the court that the appellee has never done any act whatever in this state or had any agent whatsoever at any time here, except the bringing of this suit and the employment of attorneys to conduct the same, it is difficult to understand

how the appellee comes within the class of corporations restricted. The prosecution of a suit in the courts of this state is not carrying on a business, enterprise or occupation in this state within the plain meaning of the statutory provision. 19 Cyc. 1279 and 1280, where numerous authorities in support of the text are cited.

In accepting the trust and executing the trust deed and receiving the stock certificates in New York it was not violating any law of Arizona. *Allgeyer* v. *Louisiana,* 165 U. S. 578, 41 L. Ed. 832, 17 Sup. Ct. Rep. 427; *Toledo Traction, Light & Power. Co.* v. *Smith* (D. C.), 205 Fed. 643; *Mannington* v. *Hocking Valley Ry. Co.* (C. C.), 183 Fed. 133.

"The better view seems to be that the situs of a contract, for the purpose of determining the application of the statutes excluding or imposing conditions or restrictions upon foreign corporations, is not the place where it is formally written, but the place where it is delivered and accepted." 19 Cyc. 1309.

Even if the prosecution of this suit could be considered as an act of business, it has been held by the supreme court of the territory that a single act does not constitute a transaction of business in Arizona within the meaning of the statute. *Babbitt* v. *Field,* 6 Ariz. 6, 52 Pac. 775. In Alabama, where the laws are particularly stringent in relation to foreign corporations doing business in that state, and where a single act may come within the inhibition of the law, the supreme court has distinguished between doing business or *carrying on* or engaging in business generally.

"The phrase, 'doing any business,' is more comprehensive in meaning than the carrying on, or engaging in business generally, which involves the idea of continuance, or the repetition of like acts." *Farrior* v. *New England Mortgage Security Co.,* 88 Ala. 275, 7 South. 200.

Our statute restricts the disqualification to any foreign corporation which shall *carry on* any business, enterprise or occupation in this state, involving the idea of continuation and repetition of the acts, and it is the act of such a corporation only that is within the purview of the law. There is a marked difference in doing an act of business and carrying on or pursuing a business, enterprise or occupation in this state. The former is much more restricted than the latter,

which indicates some permanency or durability, something
more than a single, temporary, or spasmodic undertaking.
Words and Phrases, Second Series, vol. 1, p. 533, "Business—
Foreign Corporation"; *Simmons-Burks Clothing Co.* v. *Lin-
ton,* 90 Ark. 73, 117 S. W. 775, 777; *Ammons* v. *Brunswick-
Balke-Collender Co.,* 141 Fed. 570, 575, 72 C. C. A. 614.   One
cannot fail to observe that the constitutional and statutory
provisions of those states cited by appellant are more restric-
tive than the laws of Arizona now in question.   Obviously
the reasonable construction of the Arizona statute is not
merely the beginning of any business, enterprise or occupa-
tion which renders every act of the foreign corporation which
has not complied with the law void, but it involves the idea
of the pursuit of it, or carrying on the business, enterprise or
occupation by such a corporation in this state which makes
the act of transacting business by such a corporation a viola-
tion of the law.

The real parties in interest are the bondholders, who ad-
vanced large sums of money on the faith of the bonds and
mortgage sought to be foreclosed.   And the suit was brought
by appellee, as the trustee of an express trust, for the bene-
fit of the bondholders.   The trustee of an express trust is
authorized by statute to bring an action, and is one of the
exceptions to the requirement that an action shall be brought
in the name of the real party in interest.   Any of the bond-
holders could have brought the suit, or the court could itself
have selected a trustee for that purpose.   Even had the
trustee been disqualified, its disqualification would not render
the securities of the bondholders void, nor would any act by
which such bondholders advanced the loan and received their
securities be a violation of the law because the trust deed was
executed in New York by a trustee who had not complied
with the laws of Arizona relating to foreign corporations en-
gaged in carrying on any business here.   A court of equity
would have ample power to give them their remedy to which
they are entitled under the law.   Even if the objection urged
here to the disqualification of the trustee to act could have
been sustained, such a disposition of the matter would not
deprive the real parties in interest of all remedy to enforce
their securities.   It would prove at most but dilatory, and its
only effect would have been to substitute one plaintiff for

another, and an entry of judgment according to the law and facts. *Farmers' Loan & Trust Co.* v. *Lake St. Elevated Ry. Co.*, 173 Ill. 439, 51 N. E. 55; *Morse* v. *Holland Trust Co.*, 184 Ill. 255, 56 N. E. 369; *Farmers' Loan & Trust Co.* v. *Chicago etc. Ry. Co.* (C. C.), 68 Fed. 412.

It is urged that the mortgage given to secure the bonds in suit is a nullity, for the reason that the bonds are not direct, fixed, unconditional obligations, but only contingent liabilities payable out of the net surplus earnings of the copper company. On this point the case of *Synnott* v. *Tombstone Consolidated Mines Co., Ltd.*, 207 Fed. 544, 125 C. C. A. 596, and on rehearing, 208 Fed. 251, 125 C. C. A. 451, is the only case cited, but cited as one persuasive because of the similarity of the bonds there with those here. In that case the company was bankrupt, and Synnott, for himself and others, filed a claim against the bankrupt based upon 461 special contract bonds of the face value of $439,055, with interest. That special contract bond provided for a retirement fund and an interest fund and the company agreed to pay the principal and interest from said retirement fund and interest fund respectively, created and maintained out of the net surplus earnings of the company as thereinafter stipulated, *but not otherwise.* It stipulated for:

" 'Clause II. . . . (b) An interest fund, which, in the opinion of the board or committee, shall be sufficient to promptly meet and pay the semi-annual interest payments on all bonds outstanding and unpaid, but which fund shall not exceed at any one time the sum of ninety thousand ($90,000) dollars; it being hereby expressly agreed and understood that no payment of interest is promised or shall be made hereunder, except from and out of the interest fund, in this clause named, and that said fund shall be created and maintained solely from the surplus earnings of the company as herein set forth and not otherwise.

" ' (c) A retirement fund, from which shall be paid from time to time the installment coupons attached to all bonds issued and sold, and to which shall be transferred all net surplus earnings of the company not required for the creation and maintenance of the special funds hereinbefore named, or for the payment of dividends upon the stock of the company, which stock dividends shall not be cumulative,

and shall not exceed four per centum per annum, until such time as all bonds issued by the company shall have been paid and redeemed.' ''

It provided:

'' 'Clause VII. It is expressly agreed and understood by the holder of this bond that the obligation hereby created is solely against the company as such, and is only against the retirement fund created from the surplus earnings of the company, as hereinbefore stipulated. . . .

'' 'Clause VIII. This bond is authorized, sold, issued, purchased, and accepted upon the terms and conditions hereinbefore stated, and none other, and no officer, agent, or other representative of the company shall have the power to waive or modify any provision or condition of this agreement, or to add any other provision or condition thereto.' ''

The referee in bankruptcy disallowed the claim on the ground that the bonds constituted contingent and not fixed liabilities of the bankrupt. On appeal to the district court of the United States the decision of the referee was affirmed and, on a further appeal to the circuit court of appeals, the judgment of the district court was affirmed. In denying a petition for a rehearing the circuit court of appeals observed:

"The case showing that there never were any surplus earnings of the company, and that, as a consequence, the funds, out of which the instruments expressly declared both principal and interest thereof was only payable were never created, we regard it as too clear for argument that there has never been any fixed liability of the company in question absolutely owing to the holders of any of the so-called bonds. The marvel to us is that such instruments with such terms and conditions could have found a purchaser other than such persons as were willing to take chances on a mining venture, such as this project evidently was in its every feature."

There is an utter dissimilarity between the terms, provisions or conditions of the bonds in that case and those in suit. It is true that each class of bonds is denominated "special contract bonds," but in the similarity of the name the likeness of one with the other ends. The likeness of the Puritan with the blackleg may be said to exist because

XVIII Ariz.—5

each is of the genus man, but in their features, conduct, feelings and habits of thought, in their sympathies, loves and hatreds, each in his kind is distinct and different, one from the other. Here, the bonds do provide for a retirement fund and an interest fund created from the surplus earnings of the company and out of which the principal and interest is to be paid, but only until a default therein occurs. Upon a default occurring, however, the bonds, by express stipulation, were absolutely and unconditionally an obligation of the company, enforceable against the entire mortgaged property through the medium of a foreclosure suit, the appointment of a receiver by the court for the trust property, and a sale of the property; the principal and interest of the bonds, and the costs and expenses of the proceedings to be paid out of the proceeds of the sale. It is as clear that there is a fixed liability of the defendant company absolutely owing to the holders of the special contract bonds in suit, as it is "too clear for argument that there has never been any fixed liability of the company in question absolutely owing to the holders of any of the so-called bonds" involved in the proceeding in the federal court, *supra.*

Complaint is made that there was no consideration for the assignment which the defendant company made to appellee of the shares of stock of the railroad and smelting company. The assignment mentions and acknowledges the receipt of a consideration of $1, "and for . . . other valuable considerations moving from the trustee and from the bondholders to the company, the receipt of which are also acknowledged," and mentions the assignment as "additional collateral to secure the payment of the principal and interest" of the bonds issued and outstanding under the mortgage. The court found as a fact, and the finding is not attacked nor is there evidence in the record to contradict it, that the shares of the railroad company and the shares of the smelting company by proper certificates were duly registered, assigned and delivered to appellee, and have remained exclusively in its possession, as additional collateral to secure the principal and interest of the bonds.

It is apparent from the recitals in the instrument of assignment, and also from the findings of fact, that the real consideration was the existing indebtedness of the copper

company; the assignment being executed for the purpose of further securing the bondholders in the payment of the bonds which had previously been issued. Shares of stock as evidenced by a proper certificate showing the ownership thereof have many, if not all, the elements of negotiability. The cases dealing with negotiable instruments are sufficiently analogous in principle to be regarded as authorities for the conclusion that an antecedent debt is sufficient to support a pledge of stock as collateral security. Whether an antecedent debt is sufficient to constitute a holding for value of collateral negotiable paper is a question upon which there is much learning in the books and considerable conflict of authority. This conflict has arisen by reason of the great authority of Chancellor KENT, who wrote the decision in *Bay* v. *Coddington*, 5 Johns. Ch. (N. Y.) 54, 9 Am. Dec. 268, affirmed, 20 Johns. (N. Y.) 637, 11 Am. Dec. 342, wherein, owing to peculiar circumstances in that case, an exception is introduced in the general rule of law governing negotiable paper to the effect that a party taking a negotiable instrument as collateral security for a pre-existing debt is not a holder for value, but is in privity with the first holder and affected by all that will affect him. To become a holder for value he must receive it "not only without notice, but in the course of business, and for a fair and valuable consideration, given or allowed, on his part, on the strength of that identical paper." A full discussion of the doctrine announced and the conflict of authority would be superfluous.

In *Swift* v. *Tyson*, 16 Pet. 1, 19, 10 L. Ed. 865, Mr. Justice STORY, speaking for the supreme court of the United States, took a different view of the matter from the doctrine announced in *Bay* v. *Coddington*, and declined to be concluded by the decisions of state courts which had adopted the rule laid down in that case. Mr. Justice STORY held to the view that the holder of negotiable paper transferred merely as collateral security for an antecedent debt is a holder for value. The utterance of this distinguished author and jurist, to the effect that a pre-existing debt is a sufficient consideration for a pledge of negotiable collaterals, was perhaps a *dictum* in *Swift* v. *Tyson*, but has since been repeatedly adhered to by that court in cases where a decision on the question was necessary to the judgment rendered. The court in that case consid-

ered itself called upon "to ascertain, upon general reasoning and legal analogies,. what is the true exposition of the contract or instrument, or what is the just rule furnished by the principles of commercial law to govern the case, . . . the true interpretation and effect whereof are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial jurisprudence."

The utterance of Mr. Justice STORY has taken deep root, and the supreme court of the United States has subsequently uniformly held in accordance with it, sustaining the rule as one which puts on the circulation of commercial paper as little restraint as possible, and therefore more reasonable and practicable. *Oates* v. *National Bank,* 100 U. S. 239, 25 L. Ed. 580; *Railroad Co.* v. *National Bank,* 102 U. S. 14, 26 L. Ed. 61; *American File Co.* v. *Garrett,* 110 U. S. 288, 28 L. Ed. 149, 4 Sup. Ct. Rep. 90.

It is to be noted that even Chancellor KENT, the author of the opinion in *Bay* v. *Coddington,* in his Commentaries, volume 3, page 81, note (b), says:

"Mr. Justice STORY on Promissory Notes, p. 215, note 1, repeats and sustains the decision in *Swift* v. *Tyson;* and I am inclined to concur in that decision, as the plainer and better doctrine. The decision in *Williams* v. *Little,* 11 N. H. 86, is to the same effect, and Chief Judge PARKER sustained the decision with force."

Following the doctrine, the supreme court of Indiana says:

"On a subject of such general importance, and concerning which there cannot properly be a local rule, and in which the commercial world has a common interest, uniformity and certainty of decision are greatly to be desired; and since the highest tribunals in this country and in England are ruling in harmony upon the point, a state court can hardly be justified in adopting if, indeed, in adhering, to, a different rule." *Straughan* v. *Fairchild,* 80 Ind. 598.

See, also, *Spencer* v. *Sloan,* 108 Ind. 183, 58 Am. Rep. 35, 9 N. E. 150; *Citizens' Nat. Bank* v. *Third Nat. Bank,* 19 Ind. App. 69, 49 N. E. 171; *Nat. Exchange Bank* v. *Berry,* 21 Ind. App. 261, 52 N. E. 104.

Citing a great many authorities, Mr. Jones says:

"The rule upon this subject having the preponderance of authority and resting upon the better reasons is, that a person

to whom negotiable paper is indorsed before maturity, as collateral security, is a *bona fide* holder for value, although he receive it as security for an existing debt. The English decisions seem to be unanimous in holding that current negotiable paper, taken as collateral security for a prior debt, is taken for value, and in the usual course of business. Lord CAMPBELL, in giving the opinion in *Poirier* v. *Morris,* said: 'There is nothing to make a difference between this and the common case where a bill is taken as security for a debt due, and in that case an antecedent debt is a sufficient consideration.' '' Jones on Collateral Securities, sec. 111, and notes.

That a creditor who has paid no new consideration on the strength of the particular paper does not take it in the ordinary course of business and is not injured by an impeachment of his title to it, the supreme court of the United States, in opposition, speaking through Mr. Justice HARLAN, says:

"The transfer of negotiable paper as security for antecedent debts constitutes a material and an increasing portion of the commerce of the country. Such transactions have become very common in financial circles. They have grown out of the necessities of business, and, in these days of great commercial activity, they contribute largely to the benefit and convenience both of debtors and creditors." *Railroad Co.* v. *National Bank,* 102 U. S. 14, 26 L. Ed. 61, *supra.*

And Mr. Justice STORY, in *Swift* v. *Tyson, supra,* observed:

"And why, upon principle, should not a pre-existing debt be deemed such a valuable consideration? It is for the benefit and convenience of the commercial world, to give as wide an extent as practicable to the credit and circulation of negotiable paper, that it may pass not only as security for new purchases and advances, made upon the transfer thereof, but also in payment of, and as security for, pre-existing debts. The creditor is thereby enabled to realize or to secure his debt, and thus may safely give a prolonged credit, or forbear from taking any legal steps to enforce his rights. The debtor also has the advantage of making his negotiable securities of equivalent value to cash. But establish the opposite conclusion, that negotiable paper cannot be applied in payment of, or as security for, pre-existing debts, without letting in all the equities between the original and antecedent parties, and the

value and circulation of such securities must be essentially diminished, and the debtor driven to the embarrassment of making a sale thereof, often at a ruinous discount, to some third person, and then, by circuity, to apply the proceeds to the payment of his debts.''

Further attention to the subject may be arrested, however, by referring to the negotiable instruments acts of many of the states, enacted to promote a uniform rule by providing that: ''Any antecedent or pre-existing debt constitutes value.'' See paragraph 3328, Revised Statutes of Arizona of 1901, and carried forward as paragraph 4170, Revised Statutes of Arizona of 1913. The existing indebtedness of the copper company was a sufficient consideration to support a delivery in pledge of the shares of stock as collateral.

It is said that ''the so-called assignment or chattel mortgage was never acknowledged or recorded as required by the laws of Arizona, and did not contain the affidavit of mortgagor and mortgagee.'' These questions are first sought to be raised on appeal; it does not appear that they were raised in the lower court. In the first place, the provision in the law requiring a chattel mortgage to be acknowledged is not pointed out, and in the second place, even if it was not recorded, it is valid and binding between the parties.

The instrument of assignment was executed long before the amendment of June 25, 1910, to the bankruptcy act. Prior to this amendment, whether the instrument be regarded as a chattel mortgage or other lien, conceding that it may be void as to creditors for want of recordation, the trustee in bankruptcy is bound by it as the bankrupt was. *Hewit* v. *Berlin Mach. Works*, 194 U. S. 296, 48 L. Ed. 986, 24 Sup. Ct. Rep. 690; *York Mfg. Co.* v. *Cassell*, 201 U. S. 344, 50 L. Ed. 782, 26 Sup. Ct. Rep. 481. And in *Holt* v. *Henley*, 232 U. S. 637, 58 L. Ed. 767, 34 Sup. Ct. Rep. 459, it was held that the amendment of 1910 did not affect any contract executed before its adoption.

Again, the questions ignore the plain language of the instrument of assignment itself. That it is a pledge of the stock as collateral security, and not a chattel mortgage, is beyond question:

''Though the title must be conveyed to constitute a mortgage, yet the transaction is not necessarily a mortgage because

the title is conveyed. There is a qualification of the general distinction between a mortgage and a pledge that a mortgage is a transfer of title, while a pledge is a mere lien, with respect to choses in action; for in most cases these cannot be pledged without transferring the title. . . . 'Thus, a transfer of stock may be absolute, but still if its object and character are qualified and explained by a contemporaneous paper which forms a part of the contract, and declares it to be a deposit of the stock as collateral security for the payment of a loan, and there be nothing in the contract to work a forfeiture of the right to redeem or otherwise defeat it, except by a lawful sale under the power expressly conferred in the agreement, the transaction will be regarded as a pledge. It is also well said that here, as in other cases, the intention of the parties and the real effect of their agreement are to be considered and respected in its enforcement; the purport and substance of the contract determines whether it shall be considered a mortgage or a pledge.' " Jones on Collateral Securities, § 9.

The transfer of the title of incorporeal property is generally an essential part of the delivery of it in pledge, and if there is doubt whether it is a pledge or a mortgage, the law favors the conclusion that the transaction is a pledge. Id., § 14.

Though it appears to have been recorded, but irrespective of this, the contention that the deed of trust covering a tract of land and a number of mill sites situate in Pinal county was never recorded in that county may be disposed of. The case of *Cooper Grocery Co. v. Park,* 134 C. C. A. 64, 218 Fed. 42, is cited, but that case is not in point because it deals with a deed of trust executed long after the amendment of June 25, 1910, and under the doctrine laid down in *Holt* v. *Henley,* 232 U. S. 637, 58 L. Ed. 767, 34 Sup. Ct. Rep. 459, the bankrupt could not contest on that point. Neither may the trustee in bankruptcy who occupies his shoes. The trustee in bankruptcy in this case does not occupy the technical position of a "purchaser for value." Trustees in bankruptcy acquired the rights, remedies and powers of a lien creditor only since the amendment of 1910, and the amendment is not given a retroactive effect.

It is objected that the court foreclosed the deed of trust upon a tract of land situate in Pima county, because the deed

of trust did not cover the land, and because the land had never been used by the copper company in connection with its business. The assigned error on this point is not argued further than to make the statement, and we do not see how it well could be, in view of the granting clause of the mortgage, as follows:

"And the company further, by these presents, does sell, assign and transfer, unto the trustee, party of the second part, its successors and assigns forever; all and singular, the rights, franchises, licenses, leases, privileges options, choses in action, and property of every kind, real, personal and mixed, now owned by the Company or which may hereafter be acquired by it with the bonds issued hereunder, or with the proceeds thereof, or otherwise."

The lower court found that this property was acquired after the date of the execution of the mortgage, and was owned by the company when the foreclosure suit was begun. The granting clause of the mortgage does not restrict it to property used in connection with the mines, smelter or railroad, and in the absence of any such restriction there can be no merit in the objection that this specific property was never used in connection with the operation of the mines, smelter or railroad.

The appellant applied to have the shares of stock of the smelting company and railroad company sold in separate parcels. It appears that when this application was made the appellant had taken and perfected his appeal to this court, and had thereby ousted the superior court of jurisdiction. In its decree directing a sale of the shares of stock of the smelting company and the railroad company the court found that it would be for the best interests of all parties concerned to have the shares of stock of the two companies sold together in one parcel. We find no error here.

We feel called upon to make some observations concerning the abstract of record presented by the appellant to this court. Many portions of the record that fairly bear upon the solution of the ten assignments of error urged were omitted therefrom, which were supplied by the appellee in a supplemental abstract. It is the duty of an appellant to furnish this court with an abstract which fairly presents all portions of the

record which may reasonably bear upon the merits of the appeal.

Upon an appeal to this court the presumption is that the judgment of the lower court is correct, and to overcome this presumption the error of the trial court must be specified, and such specification of error must be accompanied with an abstract of all that portion of the record which actuated the decision on the particular point. The idea is not to abstract such portions of the record only as are favorable to appellant's contentions, but the function of the abstract is to enable this court the more expeditiously to dispatch its large volume of business by presenting therein such portions of the record, and such portions only, as may be necessary to inform the court of the errors relied upon without an investigation of the record itself. This will of course involve some skill and labor on the part of counsel to incorporate the essentials in the abstract without a useless encumbrance of it with nonessentials, but unless the abstract of record serves a purpose of aiding the court, the idea which originated it, the requirement had better be done away with entirely. If the idea is that it is the duty of this court to go through the entire record of the case and direct the making up of the abstract of the record, it were better that we dispense with that consumption of time and try the errors upon the original record. In this case the abstract of the record on the part of appellant embraces about 180 pages of printed matter, and appellee has thought it necessary to supply its deficiencies by supplemental abstract numbering about 130 pages, the result being that in order to fairly determine the errors relied on it has been necessary to go from one abstract to the other with its attendant confusion and delay.

This is a burden that should not be put upon the appellee, nor should the labor be thrust upon the court, but the duty rests with the appellant, and unless he presents us with an abstract fairly informing the court of the errors relied upon, that is, abstracting such portions of the record as are necessary to this determination without the necessity of investigating the original record itself, and the appellee does not supply the deficiencies, but shows to the court the default of appellant, the assignment of errors to that extent must be dis-

regarded. If the rule requiring an abstract of the record is not founded upon convenience and necessity, it ought to be abolished. Otherwise, the rule ought to be observed, and the preparation of the abstract of the record made of service to the court, and not an embarrassment either to the court or to the appellee.

There appearing to be no reversible error, the judgment of the lower court is in all things affirmed.

---

ROSS, C. J., and CUNNINGHAM, J., concur.

As to whether a single or isolated transaction by foreign corporation is doing business within the state, see note in 10 L. R. A. (N. S.) 693.

On the right of foreign corporation to sue, see notes in 24 L. R. A. 289; 70 L. R. A. 514.