THE AUTOMOTIVE MATERIAL COMPANY *et al. vs.* THE
   AMERICAN STANDARD METAL PRODUCTS CORPORATION
   *et al.*—THE WM. R. JOHNSTON MANUFACTURING COM-
   PANY, Defendant in Error, *vs.* THE AUTOMOTIVE MA-
   TERIAL COMPANY *et al.*—(THE AMERICAN STANDARD
   METAL PRODUCTS CORPORATION *et al.* Plaintiffs in
   Error.)

*Opinion filed October 22, 1927—Rehearing denied Dec. 7, 1927.*

1. CORPORATIONS—*when foreign corporation is not doing busi-
ness in State within meaning of section 94 of Corporation act.* A
foreign corporation is not doing business in the State, within the
meaning of section 94 of the Corporation act, by acquiring and
holding stock of domestic corporations, by making loans and tak-
ing mortgages on land within the State or by maintaining an office
and paying and adjusting debts, where such transactions do not
constitute the business for which the corporation was organized.

2. SAME—*a contract preliminary to transaction of business in
State does not violate section 94 of Corporation act.* A foreign
corporation, in appointing an agent for the transaction of future
business in the State or in doing other acts which are merely pre-
liminary to the transaction of the business in which the corporation
is to engage, such as contracting with an individual or another
corporation to establish a certain business or carry on the business
after it is established, does not violate section 94 of the Corpora-
tion act, as the corporation should be permitted to enter into con-
tracts preliminary to the establishment of its business before being
required to obtain a license as a foreign corporation.

WRIT OF ERROR to the First Division of the Appellate
Court for the First District;—heard in that court on appeal
from the Circuit Court of Cook county; the Hon. GEORGE
FRED RUSH, Judge, presiding.

WETTEN, PEGLER & DALE, for plaintiffs in error.

CHARLES S. GRAVES, for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

George L. Moore about 1919 invented a certain patent device known as the Moore Sight-Feed Oiler, and letters patent were issued to Moore and Winthrop Burdick and were by them assigned to the Automotive Material Company. Burdick is president and Elmer R. Talbot is secretary and director of the Automotive Material Company. The American Standard Metal Products Corporation is a Delaware corporation, and at the times it entered into the two contracts hereinafter mentioned it was not licensed to transact business in the State of Illinois. Its principal office was in the city of New York. E. B. Cadwell was the president and a director of the corporation and represented it in the transactions hereinafter mentioned with the Automotive Material Company and the William R. Johnston Manufacturing Company. On December 16, 1920, Burdick and Talbot, being the owners of substantially all the capital stock of the Automotive Material Company, entered into a contract in writing with the American Standard Metal Products Corporation by which Burdick and Talbot undertook and agreed to cancel a certain license agreement existing between the Automotive Material Company and the Universal Manfacturing Company, which latter company up to that time had the right to manufacture and sell the oiling device, and it was agreed that if Burdick and Talbot should secure cancellation of said contract they would forthwith cause the Automotive Material Company to enter into a new license agreement with the American Standard Metal Products Corporation, which new agreement would be in substance as follows: The Automotive Material Company, an Illinois corporation, would grant the Delaware corporation exclusive license to manufacture and sell the patent device during the life of the patents and would assign the patents to the corporation. The Delaware corporation would thereupon commence to manufac-

ture or cause to be manufactured, and promote the sale of, the oiler; would pay a royalty for each and every device it so sold, part to be paid in cash and the balance in stock of the Delaware corporation; would pay the Illinois corporation the sum of $2000 upon the execution of the contract as advance royalty; would forthwith take over all tools, dies, etc., used in the manufacture of such device, a schedule of which was attached to the contract and marked exhibit "B," and agreed to employ Burdick and Talbot on a salary. The contract, under date of December 16, 1920, was duly signed and sealed in Chicago by the two corporations, and the American Standard Metal Products Corporation signed the contract by E. B. Cadwell, its president, and Darwin T. Root, its secretary, the contract with the Universal Manufacturing Company having been canceled.

On or about December 23, 1920, the two corporations aforesaid entered into another agreement, wherein the patents were assigned to the American Standard Metal Products Corporation, and in consideration therefor the latter corporation turned over two checks for $1000 each and three promissory notes for $1000 each to the order of the Automotive Material Company, which in turn were endorsed to the Universal Manufacturing Company as consideration for cancellation of the license agreement. The American Standard Metal Products Corporation paid $2187.55 for the material, tools, dies, etc., which were delivered at 451 East Ohio street, Chicago, according to the contract.

The contract between the American Standard Metal Products Corporation and the Johnston Manufacturing Company was duly executed in writing on February 19, 1921, at 451 East Ohio street, Chicago, and is in substance the following: The American Standard Metal Products Corporation (herein called the corporation) grants to the William R. Johnston Manufacturing Company (herein

327—24

called Johnston) the exclusive right and license to sell said oiler and all improvements thereon throughout the United States of America and all territories and all foreign countries, said license to continue to the end of the term for which the patents for the device are issued. Johnston agrees to immediately begin a sales campaign, shall use its best efforts to sell the greatest number of oilers possible, and in the event that it shall fail to purchase from the corporation a minimum of 200,000 of the oilers between the date of the contract and the first day of April, 1922, and pay for the same as provided in the contract, twenty per cent of which shall be purchased between the date of the contract and October 1, 1921, and paid for within fifteen days thereafter, the corporation shall have the right to cancel the contract, provided it gives Johnston thirty days' written notice of its intention to do so. Johnston shall have the right during the period of the thirty days to purchase the necessary number to make the total number of 200,000 specified as the minimum quantity to be purchased. In the event Johnston shall fail to purchase 200,000 of the oilers during any succeeding year the corporation shall on like notice have the right to cancel the contract, with like right to Johnston, on said notice, to purchase and pay for the amount of oilers specified in the contract. Johnston shall have the right to market the oiler under the registered trade-mark, "Johnston Sight-Feed Oiler." The corporation agrees to protect Johnston against any action for infringement of the patent, and it will make application for and procure letters patent for the device in all foreign countries where Ford cars are extensively sold. The list price of the oilers is to be not less than eight nor more than ten dollars, and the price is to be net to Johnston at 451 East Ohio street, Chicago. The oilers are to be of merchantable quality and in good working order. Johnston agrees not to purchase oilers from any other source. If the corporation fails to start delivery in reasonable quan-

tities or make delivery in such quantities, Johnston shall have the right to manufacture the oilers, or cause the same to be manufactured, in quantities sufficient to fill its customers' orders promptly. The corporation guarantees all oilers furnished Johnston to be free from defects in workmanship or material and to replace such oilers or parts when the same are returned to the corporation prepaid. As consideration Johnston was to give, and did give, the corporation $5000 in cash and four promissory notes for $5000 each, all dated April 1, 1921, and payable thirty, sixty, ninety and one hundred twenty days after date, with six per cent interest. Johnston is to have the right to deduct and retain five per cent of the price of his oilers until the full sum of $25,000 has been returned to it, and at the request of Johnston in writing five days before maturity of any note, fifty per cent of such note falling due shall be extended sixty days. In case of failure, bankruptcy or receivership of either party the contract shall become void. Voluntary cessation of business of the corporation shall give Johnston the right to manufacture or cause to have the oilers manufactured elsewhere.

On May 19, 1921, the Automotive Material Company, Winthrop Burdick and Elmer R. Talbot filed a bill in the circuit court of Cook county alleging the foregoing facts, and also alleging that they were ignorant of the fact that the corporation was not licensed to do business in Illinois at the time of the making of this contract, and that the corporation and E. B. Cadwell, its president, did know at those times that it was not licensed to do business in Illinois, and averring that the complainants' contracts with the corporation were void for the reasons aforesaid; and the corporation, Cadwell and Johnston were made parties defendant to the bill. The prayer of the bill was that the contracts between the complainants and the corporation be declared null and void and canceled by the court, the complainant company restored to its original rights and the pat-

ents re-assigned to it. The complainants offered to return to the corporation all moneys that might be found due it from the complainant corporation upon accounting. A temporary injunction restraining and enjoining the defendants from assigning, transferring, incumbering or prejudicing in any manner the property rights, patents or improvements or interests of the complainants therein was also asked by the bill, was granted by the court and was served on the defendants. The corporation and Cadwell filed a joint and several answer to the bill, denying that the complainants were without notice or knowledge of the fact that the corporation was not licensed to do business in Illinois and averring that they had such notice and knowledge. They admitted all the other facts set forth in the bill as above recited, but denied that they were doing business in Illinois that was prohibited by statute or that was illegal for any reason.

Johnston answered the bill of the complainants, denying that it agreed to purchase a minimum quantity of 200,-000 of the oilers before April 1, 1922, but admitted all other allegations contained in the bill. It also filed a cross-bill against the complainants in the original bill and the corporation and E. B. Cadwell, and alleged substantially the same facts that were alleged in the original bill and admitted by the answer of the corporation and Cadwell. It also averred that Johnston was ignorant of the fact, at the time it entered into the contract with the corporation, that it was not licensed to do business in Illinois. It further averred that the cash consideration of $5000 and the four notes of $5000 each that Johnston delivered to the corporation have never been returned to it, and that Cadwell and the corporation have failed and neglected to perform the conditions of the contract of February 19, 1921. It further averred that Johnston had expended $5000 or more in advertising the merits of the oiler and in otherwise demonstrating its merits, and that that expenditure was

made with a view of later performing and carrying out its contract with Cadwell and the corporation. The prayer of the cross-bill was for an accounting and for a decree that Cadwell and the corporation pay to Johnston the $5000 cash paid to them and the money which Johnston had expended to carry out the contract of February 19, 1921; also that they deliver to Johnston the four notes for $5000 each, and for general relief. Cadwell and the corporation answered the cross-bill, admitting the same facts which they admitted in their answer to the original bill, and denied that they were liable to account to Johnston and pay it any of the sums demanded, and denied that they were legally bound to return the notes aforesaid. They also averred that Johnston never intended to carry out its contract with the corporation; that Johnston, after it had entered into the contract with the corporation, entered into a similar contract with the Automotive Material Company with reference to the manufacture and sale of the oilers, and by reason of those facts Johnston was not in court with clean hands and was not entitled to any equitable relief prayed for in its cross-bill.

Before the cause was heard in the circuit court Cadwell purchased a controlling interest in the Automotive Material Company, and the original bill was dismissed and the temporary injunction was dissolved. On the issues made by the cross-bill and the answers thereto, testimony was taken in open court before the chancellor, who entered a decree canceling the contract of February 19, 1921, between Johnston and the corporation, and ordered that the corporation and Cadwell return to Johnston the promissory notes of the latter company which were delivered to the corporation under the contract of February 19, 1921, and taxed the costs against the corporation and Cadwell. On appeal to the Appellate Court for the First District by Johnston and cross-errors assigned by Cadwell and the corporation that court affirmed that part of the decree of the circuit

court canceling the contract and ordering the return of the notes of Johnston, but reversed the other part of the decree of that court and remanded the cause, with directions to enter a decree for the return of the $5000 cash payment to Johnston and for its recovery of $5603.45 for expenses of Johnston in advertising and demonstrating the merits of the oiler. This court awarded a writ of *certiorari* to review the judgment of the Appellate Court on the petition of Cadwell and the corporation, plaintiffs in error.

The leading and controlling question in this case is whether or not the plaintiff in error corporation was doing business in this State without a license within the meaning of section 94 of our statute on corporations, which provides that no foreign corporation doing business in this State without a license shall be permitted to maintain any suit at law or in equity in any of the courts of this State upon any demand, whether arising out of contract or tort, and prescribing a penalty of not less than $250 nor more than $1000 against any and all corporations violating said section and section 80 of the same act, providing that each foreign corporation organized for pecuniary profit (except banking, insurance, building and loan and surety companies,) not now licensed to do business in this State, shall, before it transacts any business, secure a certificate of authority therefor from the Secretary of State.

In stating the allegations of the original bill and of cross-complainant's bill and the answers thereto, we have limited our statement to the allegations bearing on the leading issue aforesaid. There are some other allegations in the bill and in the cross-bill that are omitted in our statement and which were not admitted by the corporation and Cadwell, but they are not controlling matters in this case, as all issues depend solely on the leading question just stated. If the corporation was doing business in this State within the meaning of said statute, its contract with Johnston is void. If it was not doing business within the mean-

ing of the statute its contract is a binding contract on it and Johnston and all relief asked by Johnston in its cross-bill should be denied. *Ryerson & Son* v. *Shaw, 277* Ill. 524.

The evidence before the lower court clearly shows the following facts: The corporation was a Delaware corporation engaged in the manufacturing business, with its principal office in New York, and at the close of the World War it ceased to do business as a manufacturing company. Since that time, and up to the times the contracts were executed in this State, the only business that it was doing anywhere was loaning its surplus funds to manufacturers doing business in the United States, and it loaned some of such money to manufacturers in Illinois. The inference from the record is that these loans were all made in the State of New York. There is no evidence in the record that the contracts for any of these loans were made in Illinois, but really it is not material where these contracts were made. Under the authorities of this country a foreign corporation is not doing, transacting, carrying on or engaging in business within a State, within the meaning of statutes such as ours now under consideration, by the acquisition and holding of stock of domestic corporations doing business in the State, or by making loans, or taking mortgages on land situated within the State as security therefor, when such transactions do not constitute the business for which such corporation was organized. So it has been held that a foreign corporation is not doing, transacting, carrying on or engaging in business in a State, within the meaning of such statutes, by maintaining an office therein, where the business there transacted does not come within the meaning of such statutes, by paying debts owed by it or by adjusting the same. (14A Corpus Juris, sec. 3989, p. 1280, and authorities cited.)

In the early part of 1920 E. B. Cadwell, president of the corporation, first went to Chicago as its representative for the purpose of collecting such loans as had been made

in Illinois to the Kressberg Engineering and Manufacturing Company and other industries in Chicago. On October 14, 1920, Darwin T. Root, secretary of the corporation, went to Chicago for the purpose of assisting Cadwell in straightening out the financial matters of the corporation pertaining to such loans. No representative of the corporation is shown by the evidence to have ever come to Chicago or to Illinois for any purpose other than the collecting of the loans, and is not shown to have attempted to do any other business in Illinois up to December 16 and 23, 1920, when the contracts between the corporation and the Automotive Material Company were executed. After Cadwell and Root, the president and secretary of the corporation, had gone to Chicago for the purpose of collecting the money the corporation had loaned to manufacturers in Chicago, they made their headquarters for said purpose with the Kressberg Engineering and Manufacturing Company and E. B. Cadwell & Co., who maintained their offices at 451 East Ohio street, of which corporations Cadwell was president. In December, 1920, Burdick and Talbot, who were the principal stockholders in the Automotive Material Company, by conversations with Cadwell interested him and the corporation in the Moore-Burdick Sight-Feed Oiler for Ford automobiles, and the contracts of December 16 and 23 resulted from those interviews. After those contracts were made, in January, 1921, Johnston, who was engaged in the manufacture and sale of automobile accessories, induced Cadwell and the corporation to enter into the contract of February 19, 1921. After that contract was entered into Johnston wanted a hundred of the oilers made with its trade-mark stamped thereon, for the purpose of demonstrating the merits of the same at the Boston automobile show, which occurred in March, 1921. Burdick, who was then in the employ of the corporation, went to LaCrosse, Wisconsin, and had one hundred oilers manufactured by the National Gauge Company with Johnston's

trade-mark stamped thereon and with a further change in the make-up of the oiler which was suggested by Johnston, and these one hundred oilers were delivered to the corporation and by it delivered to Johnston for the purpose of the Boston demonstration. Johnston conducted its demonstration in Boston, and also advertised by cuts and figures the oiler in all parts of the country to further demonstrate the merits of the oiler. Johnston also conducted a sales campaign for the new oiler and took a number of orders for the oiler in its changed form. The corporation and Cadwell also assembled a few of the new oilers and put them on Ford automobiles for the purpose of further demonstrating the merits of the oiler, and employed two men to assemble and install the oilers for that purpose. No further orders for oilers were ever received from Johnston by Cadwell and the corporation for the purpose of filling orders from Johnston's customers or for any other purpose, and no oilers were ever sold by Cadwell or the corporation to Johnston or to anyone.

After Johnston entered into the contract of February 19, 1921, it became dissatisfied with its contract to sell the oilers as it had agreed to do in its contract. Johnston, through its president, William R. Johnston, informed Cadwell, as president of the corporation, of its dissatisfaction with the contract, and further informed Cadwell that it could not afford to carry out the contract unless it could get a modification of it by which it could obtain the oiler at a considerably reduced price and reduce the minimum number of oilers it was required to take. Cadwell signified his and the corporation's willingness to make a modification of the contract and submitted such modifications as seemed to be satisfactory to Johnston, but Johnston and Cadwell and the corporation never got together or made any new contract, and Johnston never did anything further in the way of carrying out the original contract that was made.

On June 25, 1921, after suit was begun in this case to cancel the contracts, Johnston entered into another contract with the Automotive Material Company, which then claimed to be the owner of the patents, and thereafter ordered under that contract 10,000 oilers, and the evidence shows that it sold under the contract about 2200 oilers. Cadwell, on being informed of Johnston's action in abandoning its contract of February 19, 1921, and making the new contract, bought a majority of the stock of the Automotive Material Company to protect the corporation and himself. After that action on the part of the corporation and Cadwell the Automotive Material Company dismissed its original bill.

Cadwell, after entering into the contracts of December, 1920, and February 19, 1921, employed Talbot and Burdick for the corporation, but they performed no labor other than work preparatory to the fulfilling of the contract with Johnston, such as assembling and installing oilers for the purpose of demonstration and ordering oilers from the National Gauge Company for Johnston's demonstration in Boston. During all the times aforesaid Cadwell and Root, for the corporation, occupied the offices of the Kressberg Engineering and Manufacturing Company and E. B. Cadwell & Co. They did not have any office furniture or office equipment in Chicago at that place or elsewhere in Illinois, and transacted no business except looking after the loans of the corporation and doing the preliminary work preparatory to fulfilling the contract with Johnston. The corporation had no banking account in Chicago. It did not have its name on the doors at 451 East Ohio street. In writing letters concerning its preliminary work of carrying out the contract with Johnston it used the same letterheads that it had used in the New York office, but there was stamped thereon with a rubber stamp, "Chicago Office, 451 East Ohio street." It kept books at 451 East Ohio street for about four months, but the transactions entered

in the books were only such transactions as showed their expense accounts concerning the loan business and the preliminary work for carrying out the contract with Johnston. After entering into the contracts of December, 1920, and February 19, 1921, Cadwell, for the corporation, through its New York attorneys, communicated with the Secretary of State to learn what it would cost the corporation to obtain a license to transact its business in Illinois and ascertained that it would cost $7000 to obtain such a certificate. Cadwell, with a view of obtaining for the corporation such license, called a meeting of the stockholders of the corporation to reduce its capital stock to such an amount that it could obtain a license at a more reasonable cost. The corporation authorized such a reduction, but before it could obtain a certificate the fact that Johnston was not likely to carry out its contract was developed, and therefore the obtaining of the license was deferred until the corporation could satisfy itself that it would do business in Illinois under the Johnston contract, and it clearly appears that the bringing of the suits stopped the corporation from any further undertaking to obtain a license in Illinois. The evidence clearly shows that the corporation did not transact business in Illinois within the meaning of our statute, and that it did not intend to transact such business, within the meaning of our statute, until it had secured such license. The cross-bill of Johnston should therefore have been dismissed for want of equity.

It is well established by the authorities of this country that a foreign corporation is not doing, carrying on, transacting or engaging in business in a State, within the meaning of statutes like ours now under consideration, by merely appointing an agent for the transaction of future business therein. The qualifying of such agent for the transaction of such future business by taking a bond from such agent does not come within the meaning of the statute. (14A Corpus Juris, sec. 3985, p. 1279, and authorities cited.)   It

is also established by the authorities of this country that a foreign corporation is not doing, transacting, carrying on or engaging in business in a State, within the meaning of such statutes, by the doing of acts therein which are merely preliminary to the transaction of the business in which the corporation is to engage, such as offering bids in the State on work to be performed therein, entering into a contract to perform such work, or by giving a bond to secure performance of such contract. (14A Corpus Juris, sec. 3986, p. 1279, and authorities cited.) As sustaining this proposition we also cite as applicable to this case *State* v. *American Book Co.* 1 L. R. A. (n. s.) 1041, and *Hogan* v. *City of St. Louis,* 75 S. W. 604. It is pointed out in those decisions that entering into a contract similar to the one now under consideration is undoubtedly "transacting business" within the unlimited meaning of that term, but that such is not the sense in which the term is used in the statutes, and that it means carrying on work or transacting the business for which the corporation was organized or in which it is to engage, and that it means performing the work or business called for by the contract. If such is not the true interpretation of the statute, foreign corporations in many instances would be compelled to incur the expense of becoming licensed to do business in another State without any assurance whatever that they could contract to do such business or do such business after being licensed to do the same. Ofttimes a foreign corporation may have occasion to bid for a job in its line of business that would· mean to it contemplated profits, but if it had to be licensed before it could bid on such a contract, or contract to do such work, the opportunity to do the same would be gone. To hold that it had to be licensed before it contracted for or secured business to be done would be unreasonable.

For the reasons aforesaid the contract of the cross-complainant and the corporation is a binding contract and

cannot be rescinded or annulled for any of the reasons urged by Johnston. The judgment of the Appellate Court and the decree of the circuit court are therefore reversed.

*Judgment reversed.*