[Civil No. 4521.   Filed April 19, 1943.]

[136 Pac. (2d) 265.]

HARRY JAMISON and CHARLOTTE JAMISON, Husband and Wife, Appellants, v. THE FRANK-LIN LIFE INSURANCE COMPANY, a Corporation; O. C. WILLIAMS, as State Land Commissioner of the State of Arizona; B. G. HARRISON and HENRY H. CLARK, Appellees.

Messrs. Armstrong, Kramer, Morrison & Roche, and Mr. Guy Axline, for Appellants.

Messrs. Fennemore, Craig, Allen & Bledsoe, for Appellees Franklin Life Insurance Company and B. G. Harrison.

ROSS, J.—This action involves the question as to who is the owner of certain land leases from the State of Arizona and seeks to have that question decided. The plaintiffs, Harry Jamison and Charlotte Jamison, husband and wife, claiming to be the owners, commenced this action against the Franklin Life Insurance Company, a corporation, which also claims ownership

thereof by virtue of a settlement agreement hereinafter set out.

Defendant B. G. Harrison is an officer and agent of the defendant corporation, Henry H. Clark is the escrow keeper of the land leases and O. C. Williams is the State Land Commissioner of the state.

The Insurance Company, in addition to its answer to plaintiffs' complaint, filed a counterclaim which it later dismissed, leaving the issues those made by the complaint and answer.

On December 27, 1941, the defendants filed their motion for a summary judgment and on December 30, 1941, plaintiffs likewise moved for a summary judgment, each basing his motion on the pleadings, depositions, admissions and affidavits then on file with the court. These motions were made pursuant to the statute providing for summary judgments. Section 21–1212, Arizona Code 1939, reads:

*"Summary judgment — Motion and proceedings thereon.*—The motion shall be served at least ten (10) days before the time specified for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that, except as to the amount of damages, there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

After considering the motions, the court on February 20, 1942, made findings of fact, conclusions of law and entered judgment for defendants. The plaintiffs have appealed.

This action is a by-product of another action between the parties hereto, which was brought in the Superior Court of Apache County (the county where the property involved is located and where plaintiffs reside)

and therein prosecuted to final judgment, being Cause No. 2065. It is the contention of defendants that the judgment in that action on all issues was in their favor and that such judgment is fully sustained by the law and the evidence. This is disputed by plaintiffs and the basis of their contention can best be presented in a statement of the salient facts out of which the present litigation has grown.

Plaintiff Harry Jamison was engaged in the business of growing and handling range livestock under the name of the Apache Land and Cattle Company, a Colorado corporation with headquarters at Navajo Springs in Apache County, Arizona, and had been so engaged from about July, 1925. The Apache Company was incorporated with a capital stock of 5,000 shares and Jamison owned all of said shares except three and was its president and general manager. Beginning in 1925 and from time to time the Apache Company had borrowed from the Insurance Company large sums of money which at the times herein mentioned amounted to $246,031.33, secured by a realty mortgage on 56,244 acres of patented real estate belonging to the Apache Company and 93 leases from the State of Arizona of state lands to Harry Jamison, covering 56,414 acres, as additional collateral security and assigned by Jamison and his wife to B. G. Harrison, agent of the Insurance Company.

With the debt long overdue, and the Insurance Company insisting that it be paid, on or about June 17, 1940, Jamison and B. L. Tamplin, secretary-treasurer of the Apache Company, went to Springfield, Illinois, where the officers and directors of the Insurance Company reside, and, after canvassing the situation together, the parties made and entered into the following agreement, omitting signatures:

"THIS AGREEMENT MADE in quadruplicate this 17th day of June, A. D. 1940, by and between THE FRANKLIN LIFE INSURANCE COMPANY, a corporation of Springfield, Illinois, hereinafter referred to as First Party, B. G. HARRISON, a resident of Springfield, Illinois, hereinafter referred to as Second Party, THE APACHE LAND AND CATTLE COMPANY, a corporation of Denver, Colorado, hereinafter referred to as Third Party, and HARRY JAMISON, a resident of Denver, Colorado, hereinafter referred to as Fourth Party, WITNESSETH:

"WHEREAS, said Third Party is indebted to said First Party for money borrowed, which indebtedness is secured by a first mortgage dated July 1, 1930, on 56,242.87 acres of land located in Apache County, Arizona; and

"WHEREAS, Second Party is interested in acquiring by assignment certain State Land leases on 56,412.05 acres of land located in said Apache County, Arizona, which said leases are now held in the name of HARRY JAMISON of Denver, Colorado, Fourth Party, herein; and

"WHEREAS, the said Fourth Party has, at the request of First Party, and for valuable consideration, executed a proper assignment of said leases, together with applications to the Arizona State Land Board for authority to assign the same, to the said Second Party for the purpose of further securing the payment of said indebtedness owing by the said Third Party to the said First Party; and

"WHEREAS, said applications to assign and said assignment have been lodged with HENRY H. CLARK, Attorney at Law of Denver, Colorado, to be held by him as Escrow Agent in strict compliance with the terms hereof and not otherwise; and

"WHEREAS, the said Third Party is unable to pay the indebtedness secured by said mortgage aforesaid according to the tenor and effect of a certain promissory note of even date, given in evidence thereof to the said First Party, and it is desired on the part of all of the parties hereto to liquidate said indebtedness and fully cooperate with each other to that end,

yet preserve unto said Third Party certain rights of redemption,

"WITNESSETH:

"NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained, and the payment by each of said parties to the other of the sum of One Dollar, the receipt whereof is hereby respectively acknowledged, IT IS AGREED as follows:

"(1) That the said applications to assign and assignment of said leases aforesaid shall be held by the said HENRY H. CLARK as Escrow Agent and by him delivered to the said Second Party on March 15, 1941, unless the said Third Party, or some one upon its behalf, shall, on or prior to March 15, 1941, pay to said Escrow Agent the sum of One Hundred Fifty Thousand ($150,000.00) Dollars in cash, less the credits hereinafter mentioned, in which event the said Escrow agent shall redeliver to said Third Party, or its nominee, said applications to assign and assignment.

"(2) That in the event of the payment of said sum aforesaid to said Escrow Agent within the time herein limited, that the said First Party shall by proper instruments in writing assign and quit claim to said Third Party, or its nominee, all right, title and interest that it now has, or may hereafter acquire, in the 56,242.87 acres of land described in said mortgage aforesaid, together with the notes and mortgage relating thereto, and all right, title and interest that it or B. G. HARRISON now has, or may hereafter acquire, in said State Land leases, and the said Escrow Agent shall, thereupon, deliver said sum of One Hundred Fifty Thousand ($150,000.00) Dollars, less credited rentals, to said First Party and be discharged of any further obligations or duties hereunder.

"(3) That unless said sum of One Hundred Fifty Thousand ($150,000.00) Dollars, less credited rentals, shall be paid to said Escrow Agent on or before March 15, 1941, in accordance with the terms hereof, that said Escrow Agent shall, thereupon, deliver to the said Second Party all of the executed applications to assign

and the assignment of said State Land leases aforesaid, and said Third and Fourth Parties shall, thereupon, cooperate with said First and Second Parties to secure the consent to and approval by the State Land Commissioner of Arizona of said assignment to Second Party and execute and deliver to said Second Party any and all other instruments in writing that may be requisite and necessary to vest complete title to said leases in him; that upon the delivery of said applications to assign and said assignment aforesaid by the Escrow Agent herein to the said Second Party, that said Escrow Agent shall be discharged of any and all other obligations hereunder.

"(4) That the said First and Third Parties, during the life of this Agreement, or any extension thereof that may hereafter be executed, shall divide equally all net revenues of every kind and nature derived from the use of the land described in said mortgage, or from placing cattle upon the State Land covered by said leases from the date of the execution and delivery hereof until March 15, 1941, or any later date to which the same may be extended, and such division shall be made as collected or received by either of the parties hereto, or their respective agents or employees, and any payment so made to the First Party shall be applied and credited by it upon the aforesaid principal sum of One Hundred Fifty Thousand ($150,000.00) Dollars to be paid under the terms and conditions herein set forth.

"(5) That this Agreement shall be executed by the parties hereto in quadruplicate, each copy of which shall be for all purposes considered an original.

"IN WITNESS WHEREOF the said THE FRANKLIN LIFE INSURANCE COMPANY has caused its name to be hereunto subscribed by its Vice-President and its seal properly affixed and attested by its Assistant Secretary, all pursuant to due authority conferred upon them by its Board of Directors, and the said THE APACHE LAND AND CATTLE COMPANY, a corporation, has caused its name to be hereunto subscribed by its President and its seal properly affixed and attested by its Secretary, all pursuant to due authority conferred upon them by its

Board of Directors, and said individuals herein named have hereunto placed their respective hands and seals, all the day and year first above written."

In accordance with the terms of this agreement the plaintiffs, husband and wife, duly executed proper assignments of the state land leases together with applications to the State Land Commissioner for authority to assign the same to B. G. Harrison (agent of the Insurance Company) "for the purpose of further securing the payment of said indebtedness." (Recital 3). It is the contention of the plaintiffs, and they prosecute this action on that theory, that the assignments of leases here provided for were made as collateral security, whereas the defendants insist the whole context of the agreement shows that the assignments were in fact a conditional sale of the leases, to become an absolute sale upon the failure of the plaintiffs to pay to the Insurance Company, or its agent, the compromise sum of $150,000 as stipulated in the agreement.

The trial court agreed with this construction of the agreement and entered judgment for defendants. It is from this judgment that the appeal is taken.

It is apparent in all of the dealings between the parties that the holdings of the Apache Land and Cattle Company and the Jamisons were treated as a unit and that as such they were mortgaged and pledged to the Insurance Company. This was the situation until the parties met and entered into the above written agreement.

It was the opinion of the trial court that the parties by such agreement undertook to settle all their differences on a give-and-take basis, that is, that the Insurance Company, for the $150,000 to be paid to it, or its agent, on March 15, 1941, would step out of the picture and leave everything, including livestock, ranges, both patented lands and leases on state lands, to the Jamisons, or the Apache Company, but should the Apache

Company or the Jamisons, or a nominee of theirs, fail to make such payment and arrange credits as stipulated, then the livestock outfit, including everything, would belong to and become the property of the Insurance Company, the idea of the settlement being that such outfit, including ranges, should be kept intact regardless of which became the owner thereof.

It will be noted that the operative portions of the agreement are divided into four parts, the third one of which conclusively shows that it was intended by the parties that a failure by the Apache Company and Jamison to pay to the Insurance Company the $150,000 stipulated by March 15, 1941, and to make certain other credit adjustments should result in the title of the property going to the Insurance Company, and not only that but therein the Apache Company and Jamison agree to bind themselves to

"cooperate with said First and Second Parties (Insurance Company and Harrison) to secure the consent to and approval by the State Land Commissioner of Arizona of said assignment to Second Party (Harrison) and execute and deliver to said Second Party any and all other instruments in writing that may be requisite and necessary *to vest complete title to said leases in him.*"

██ Granting that the recital part of the agreement showed that the leases of the state lands to the Apache Company and Jamison were security for the payment of its or their indebtedness to the Insurance Company, the operative part of the agreement shows conclusively that such leases were to go with and remain a part of the ranch and range and whichever finally became, under the agreement, the owner of the deeded land should also have the leases of the state lands. If the operative portion of this agreement is clear, and we think it is, then it will prevail over the recitals. A fair and reasonable view of the

recitals in this agreement would seem to be a recognition that the leases had theretofore been pledged as security for the debt of the Apache Company and Jamison and not that they should remain such after the execution of the settlement agreement. The rule of construction, where there is a conflict in the recitals and the operative parts of a contract, is well settled and is stated in *Williams* v. *Barkley,* 165 N. Y. 48, 58 N. E. 765, 767, as follows:

"If the recitals are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous and the operative part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part is to be preferred. [Citing cases.]"

Other cases to the same effect are: *Wilson* v. *Towers,* 4 Cir., 55 Fed. (2d) 199; *Crowell* v. *Gould,* 68 App. D. C. 297, 96 Fed. (2d) 569; *Berg* v. *Berg,* 201 Minn. 179, 275 N. W. 836; *Martin* v. *Rothwell,* 81 W. Va. 681, 95 S. E. 189. See, also, 12 Am. Jur. 776, § 242; 17 C. J. S., Contracts, p. 733, § 314.

█ The Insurance Company is an Illinois corporation and at the time it made the loan to the Apache Company and Jamison it had not complied with the Arizona laws to qualify it to do business in the state. Section 53–801. It is true that said section and the one following it require foreign corporations to qualify as therein prescribed before doing any business in the state and forbid them to transact business until they have done so. The agreement that we have been discussing, under which the leases of state lands were placed in escrow with Henry H. Clark, escrow keeper, pending the determination as to which of the contracting parties would be entitled to receive the leases, was dated June 17, 1940. On May 28, 1940, the Insurance Company duly qualified to do business in Arizona. Un-.

der the ruling of this court in *Woodward* v. *Fox West Coast Theaters,* 36 Ariz. 251, 284 Pac. 350, the Insurance Company was in June qualified under the law to take title to the property, and that is all that was necessary.

It is next contended that the assignments of the leases of state lands were void since in June, 1940, when such assignments were made, there was no law in Arizona providing that leases of such lands could be assigned, pledged or mortgaged. As we have heretofore stated, the settlement agreement did not effect, nor was it intended that it should effect, an assignment of the leases but was an option thereof.

The next point is that section 11–305 provides that a lessee of state lands may assign his lease "only with the written consent of the commissioner" and that such consent has not been given. The affidavit of the State Land Commissioner filed in the case is to the effect that he would approve the assignments of leases by Jamison and his wife except for the pendency of this action and that his failure to give his written consent to such assignments is due solely to the litigation.

Plaintiffs' points 4, 5, 6 and 8 are made on the assumption that the settlement agreement of June 17, 1940, was not final and conclusive on them. That it was, we think we have already shown.

Plaintiffs' point 7 is that Charlotte Jamison did not sign or authorize the agreement dated June 17, 1940, to settle their differences. The plaintiffs' complaint admits that, in pursuance of said agreement, they did "make and execute the 93 attempted assignments" of leases.

Finally, plaintiffs claim that the leases in question were all the time community property, partaking of the realty, and could not be conveyed except by an instrument executed, and acknowledged by both hus-

band and wife, as provided in section 71–409. The agreement of settlement dated June 17, 1940, was signed by both the husband and wife and acknowledged in accordance with the law. The transfer of titles to the leases was effected by court decree in pursuance of the terms of such agreement.

If the contentions of plaintiffs should be sustained, we would have this deplorable situation: The Jamison or Apache Company range, instead of being a compact body of land, fenced and cross-fenced for convenient use, would be split into two equal portions, requiring the removal of the fences and a complete readjustment of the range. Instead of a compact range of 112,658 acres, the area would be broken down into as many separate units as there are sections and would be destroyed as a livestock range. The owner of the patented acreage would be compelled to remove his fences from around the leased lands, and the owner of the leases of state lands could not fence or utilize his territory as a body but only in single units. This is so obvious that we conclude that at the time of the settlement agreement, all parties recognized the situation and dealt accordingly.

The judgment of the lower court is affirmed.

McALISTER, C. J., and STANFORD, J., concur.