**WORCESTER FELT PAD CORPORATION, Appellant,**

v.

**TUCSON AIRPORT AUTHORITY,**
**Appellee.**
**No. 14462.**

United States Court of Appeals
Ninth Circuit.
Feb. 23, 1956.

As Amended on Denial of Rehearing
May 3, 1956.

---

1. The bomb was marked, but in such a manner as not to attract notice by a casual observer.

A. S. Cutler, New York City, C. Wayne Clampitt, Tucson, Ariz., for appellant.

Boyle, Bilby, Thompson & Shoenhair, James P. Boyle, B. G. Thompson, Richard B. Evans, Tucson, Ariz., for appellees.

Before POPE and FEE, Circuit Judges, and JAMES M. CARTER, District Judge.

**JAMES M. CARTER, District Judge.**

The questions presented by this appeal are: (1) Whether a foreign corporation, organized to do a manufacturing business, may lawfully lease property in Arizona without first complying with the laws of Arizona imposing certain conditions, requirements and restrictions upon foreign corporations "before entering upon, doing, or transacting any business, enterprise or occupation" in the state; and (2) Whether at the trial there was introduced sufficient evidence of fraud to present a question for the jury.

Appellant, Worcester Felt Pad Corporation, hereafter referred to as Worcester, is a Massachusetts corporation organized for the purpose of manufacturing household items. Appellee, Tucson Airport Authority, hereafter referred to as Tucson, is an Arizona corporation. The case arises under the diversity jurisdiction of the district court.

In March of 1949, Worcester and Tucson entered into a lease, wherein Tucson agreed to lease certain airport premises to Worcester for three years at a rental of $100 per month, with an option in Worcester "to extend this lease for a further period of three years upon the same terms" and a further option to extend the same for two subsequent three year periods, provided the preceding options were exercised. The lease, furthermore included a right of Worcester to sublet; and a right of recapture or termination by either party in the event of federal, state or local government action during national emergency "depriving either the lessee or lessor of normal enjoyment" of the property. The evidence is in conflict as to whether at the time the lease was executed, Worcester intended to operate a branch plant at the Tucson location, or to sub-lease the premises to its subsidiary or others.

In the latter part of March 1949, Worcester began moving machinery to the Tucson Airport and shortly thereafter manufacturing household items at the Tucson location. Such operation continued until October 1951, at which time Worcester received a letter from Schmidt, General Manager of Tucson, dated October 18, 1951. The letter expressly directed attention to the recapture clause of the lease and informed Worcester that Tucson had been advised " * * * by the Officer-In-Charge, Air Force Plant Office, Grand Central Aircraft Company, Glendale Region, Western Air Procurement District, that the Federal Government requires the use * * * " of the space then being occupied by Worcester; and further stated that the " * * * request has been verified by the Chief, Airport Division, Civil Aeronautics Administration, Los Angeles, by a communication dated October 9, 1951, as an action consistent with the demands of the national emergency and one which constitutes an exercise of proper authority for the use of said space." Allegedly, in belief that the lease was being validly terminated under the recapture clause, aforementioned, Worcester vacated the premises.

In April 1952, Worcester filed suit in the district court against Tucson, alleging that Tucson had fraudulently terminated the lease; that in truth and in fact the Federal Government had not

required the leased premises which Tucson well knew, but that the premises were to be leased to a civilian private concern, Grand Central Aircraft Company, at an increased rental, as Tucson well knew.

During the course of the trial, before a jury, Tucson was allowed to amend its answer to assert that Worcester had not complied with the laws of Arizona pertaining to foreign corporations doing business within the state, and that the lease was therefore void. Tucson then offered proof of noncompliance by Worcester with such laws.

At the close of the case, after both sides had completed the presentation of their evidence, Tucson moved for a directed verdict on the grounds, (1) that Worcester had failed to prove fraud, (2) that no constructive eviction had been proved, and (3) that Worcester had never qualified to do business under the Arizona statutes, and that therefore the lease was void. The motion for a directed verdict was granted on the last ground stated. The court instructed a verdict for Tucson. It was returned by the jury and judgment entered thereon.

### Was the Lease Void under the Arizona Statutes?

Tucson contended, and the court held the lease to be void for Worcester's failure to comply with Sections 53–801 and 53–802, Arizona Code Annotated 1939 [A.R.S. §§ 10–481, 10–482], providing:

*Sec. 53–801*, "Any foreign corporation, before entering upon, doing, or transacting any business, enterprise, or occupation, in this state shall; * * *" file a copy of its articles with the corporation commission, publish its articles, appoint a statutory agent in counties in which it intends to do business, pay a license fee "and obtain from said corporation commission a license to do business in this state. * * *"

*Sec. 53–802*, "No foreign corporation shall transact any business in this state until it has complied with the requirements of the preceding section, and every

act done by said corporation prior thereto shall be void."

Worcester contends that the act of entering the lease was *incidental*, or at most *preliminary* to "entering upon, doing, or transacting" business in the state, and not an act covered by the statute. Conversely Tucson contends that Section 53–802 of Arizona Code Ann. 1939 is unequivocal in declaring "every act" done by a foreign corporation before complying with Section 53–801 of Arizona Code Ann.1939, is void.

■ In a diversity action, as here, the Federal court sits as "another court of the State," Guaranty Trust Co. of N. Y. v. York, 1945, 326 U.S. 99, 108, 65 S. Ct. 1464, 1469, 89 L.Ed. 2079, and the validity of the lease is governed by the Arizona statute as construed by the courts of Arizona. Metropolitan Life Ins. Co. v. Kane, 7 Cir., 1941, 117 F.2d 398, 133 A.L.R. 1163; Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

The "doing business" statute first appeared in the Arizona Code of 1901. It was amended by the Code of 1913. There have been seven instances in which these statutes were considered by the Arizona courts. One other case arose under the Code of 1939.

McKee v. Stewart Land & Livestock Co., 1925, 28 Ariz. 511, 238 P. 326, at page 327, summarized the holdings to the date of that case,

"* * * We have held in four different cases 'that to come within the statute a corporation must be engaged in an enterprise of some permanence and durability and must transact within the state some substantial part of its ordinary business, and not merely a single act.' Monaghan & Murphy Bank v. Davis [1925, 27 Ariz. 532] 234 P. 818; Nicolai v. Sugarman Iron & Metal Co. [1922] 23 Ariz. 230, 202 P. 1075; Martin v. Bankers' Trust Co. [1916] 18 Ariz. 55, 156 P. 87, Ann.Cas.1918E, 1240; Babbitt v.

Field, [1890] 6 Ariz. 6, 52 P. 775. * * * Of the cases cited, two were decided under the Code of 1901 and two under the Code of 1913. We do not feel that the amendment, which consisted merely of adding to the words 'carry on' the words 'do or transact,' changes the law so as to prohibit a single act. All of the words quoted are governed by the words 'business, enterprise or occupation.' "

Woodward v. Fox West Coast Theaters, 1930, 36 Ariz. 251, 284 P. 350, indicated no contrary view and National Union Indemnity Co. v. Bruce Bros., 1934, 44 Ariz. 454, 38 P.2d 648, at page 651, reiterated the substance of the statement from McKee v. Stewart Land & Livestock Co., supra. In Jamison v. Franklin Life Ins. Co., 1943, 60 Ariz. 308, 136 P.2d 265, there was involved the statute with amendments as it stood in 1949, the date of the inception of the case at bar. The court relied on the Woodward v. Fox West Coast Theaters case, supra, decided under the provisions of the Arizona Code of 1913.

We have examined the statute from the Arizona Code of 1939, Secs. 53–801 and 53–802, above quoted and find only a recasting of language and no substantial change in meaning from the provisions of the Arizona Code of 1913.[1]

As McKee v. Stewart Land & Livestock Co., supra, said of the words "carry on," " 'do or transact' " from the earlier statutes, "all the words quoted are governed by the words 'business, enterprise or occupation' ", 238 P. at page 327, so the words "entering upon, doing, or transacting" from the 1939 Code are governed by the same words, "business, enterprise, or occupation."

It will be noted that Sec. 53–801 Arizona Code Annotated 1939, provides that the foreign corporation "before entering upon, doing, or transacting any business, enterprise, or occupation, in this state shall * * * obtain from said corporation commission a license to do business in this state." The words "any business, enterprise, or occupation" do not refer to single act, but instead to a plurality of acts. The license requirement would indicate that the intent of the legislature was directed toward "doing business." A close reading of Sec. 53–802 Arizona Code Annotated, 1939, indicates the same intent. Further support is found in Monaghan & Murphy Bank v. Davis, 1925, 27 Ariz. 532, 234 P. 818. There the plaintiff, a foreign corporation, did the single act of loaning money in Arizona and the court said, 234 P. at page 819, "defendant was therefore required to prove a general course of loaning money by plaintiff in Arizona * * * " to sustain a defense under the statute.

The power of a state to impose terms upon which a foreign corporation shall be allowed to carry on business within the state is well settled. Union Brokerage Co. v. Jensen, 1944, 322 U. S. 202, 209–212, 64 S.Ct. 967, 972, 88 L.Ed. 1227.

A statute should be construed as a whole and in light of its purpose, Adams v. Bolin, 1954, 77 Ariz. 316, 271 P.2d 472. The doing business statutes and the information secured by the state on compliance therewith, are "conventional means of assuring responsibility and fair dealing on the part of foreign corporations coming into a State." Union Brokerage Co. v. Jensen, supra. See: Crites v. Associated Frozen Food Packers, 1948, 183 Or. 191, 191 P.2d 650, 653; 23 Am.Jur. 234. Such statutes, thus pointed, have in logic no application to the incidental or preliminary act of the foreign corporation in acquiring a lease or ownership of property.

1. Revised Statutes of Arizona of 1913, Sec. 2226, "Any company incorporated under the laws of any other state, territory, or any foreign country, which shall carry on, do, or transact any business, enterprise, or occupation, in this state shall, before entering upon, doing, or transacting such business, enterprise, or occupation * * * ".

A distinction can be drawn between an act preparatory to entering business and an act of carrying on or pursuing business. If a foreign corporation planning to do business within the state had to forestall the execution of a favorable preliminary contract for the acquisition of a lease or fee title to ground, it might very well lose the thing which had motivated its desire to do business within the state. See Philip A. Ryan Lumber Co. v. Ball, Tex.Civ.App.1915, 177 S.W. 226; Friedlander Bros. v. Deal, 1928, 218 Ala. 245, 118 So. 508; Automotive Material Co. v. American Standard Metal Products Corp., 1927, 327 Ill. 367, 158 N.E. 698.

Tucson contends National Union Indemnity Co. v. Bruce Bros., supra, is controlling. We disagree. The contract sued on by Bruce Bros., was not an initial, preliminary or single act done by the plaintiff. It was a later act,—one part of extensive activity within the state, and constituted part of doing business by the plaintiff.

McKee v. Stewart Land & Livestock Co., supra, a case involving plaintiff's right to sue where there had been no compliance with the doing business statute, stated, 238 P. at page 327, "It would be a serious thing indeed to refuse to any citizen of the United States, or indeed to an alien, individual or corporate, the privilege of *appearing in court and there presenting any rights which it might have,* and we should not hold our statutes mean this except on the clearest and most unequivocal language, * * *" [emphasis added]. We paraphrase the statement by substituting the words "of owning or leasing property," for those in italics.

By our holding we do not reach a constitutional question as to whether a state by a statute regulating the doing of business by a foreign corporation within its limits may deprive the corporation of real or personal property it has acquired, preparatory to engaging in business.

■ In conclusion, the execution of a lease, an act which is merely incidental and preliminary to the business in which the corporation is ordinarily engaged or is about to engage, does not constitute "entering upon, doing, or transacting any business, enterprise or occupation" within the meaning of the Arizona statute, see 14(a) Corpus Juris, Sections 3982–3986; 20 C.J.S., Corporations, § 1831, Friedlander Bros. v. Deal, supra, and is not void. It was, therefore, error for the trial court to grant the motion for a directed verdict and remove the case from consideration by the jury on this ground.

**Was There an Insufficient Showing of Fraud, Which Would Sustain the Court's Order?**

■ Although the motion for a directed verdict was also based upon the ground that plaintiff had not proved fraud, the trial court did not base his ruling on this ground. We assume he concluded that the showing was sufficient. However, if the trial judge was correct in the decision or order made, he should be sustained even if he gives the wrong reason or bases his ruling on the wrong ground. Mosby v. Manhattan Oil Co., 8 Cir., 1931, 52 F.2d 364, 368–369, 77 A.L.R. 1099; Wagner v. United States, 9 Cir., 1933, 67 F.2d 656, 657; Helvering v. Gowran, 1937, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224; Taylor v. Hubbell, 9 Cir., 1951, 188 F.2d 106, 108; Balestreri v. United States, 9 Cir., 1955, 224 F.2d 915, 917, note 1.

■ Considering the evidence in the light most favorable to Worcester's case, and indulging all reasonable inferences which may be drawn from the evidence, Vascacillas v. Southern Pac. Co., 9 Cir., 1918, 247 F. 8; Hoff v. Donaldson, 7 Cir., 1950, 184 F.2d 419; Ove Tysko v. Royal Mail Steam Packet Co., 9 Cir., 1936, 81 F.2d 960, we believe there was sufficient evidence from which the jury might properly have found fraud, and the trial court's ruling in granting a directed verdict cannot be sustained on this ground.

The complaint of Worcester alleges the necessary facts for a fraud case under

**50**

Arizona law. Tucson's brief contests the proof of false representation, knowledge on the part of the maker of the representation, and the right of Worcester to rely. These were all questions of fact.

In the letter of October 18, 1951, by Schmidt, General Manager of Tucson, to Worcester, terminating the lease, reference was made to the recapture clause of the lease, and therein Schmidt stated to Worcester, that *"the federal Government requires the use of certain space"* occupied by Worcester. Schmidt did not quote from or summarize the letter he had received from Pattillo, the officer in charge, Air Force plant office, Grand Central Airport Company, stating that Grand Central Airport Company needed space. In a letter from Schmidt to Pattillo prior to October 18, 1951, Schmidt indicated he knew the difference between "condemnation" and voluntary relinquishment; that a literal reading of Pattillo's request "would require condemnation;" that Schmidt made a "broader interpretation" of Pattillo's request "namely that we proceed to make available all * * * space * * * where legally permissible * * *. You understand that the lease will have to be terminated by due notice * * * negotiations toward favorable settlement will require time * * * must necessarily proceed with care * * *. Several possible courses are open to us but each represents a policy determination which must have Board Action * * *".

Schmidt testified as a witness and stated he did not know whether Pattillo had or had not authority to demand or take the space involved. The testimony demonstrated he was a man of long experience and knew the difference between a request by the Government and one by a civilian concern. He said he later learned Pattillo lacked authority. Another witness testified that Schmidt admitted he had received a $2000 salary increase "out of this." Tucson subsequently rented to Grand Central at a greatly increased rental.

It is often the case, in matters of fraud, that the physical facts are made to appear as being entirely legal, to in fact cover up a fraudulent intention. In view of the fact that Schmidt's credibility and that of other witnesses was a question for the jury, the jury would have been entitled to infer that the transaction was a fraudulent one and that Schmidt had knowingly made a false statement with intention to mislead Worcester, when he stated that the government *required the property*, and knowingly concealed the fact that Pattillo asked for it in behalf of Grand Central.

### Constructive Eviction

A further ground for Tucson's motion for a directed verdict was that no constructive eviction had been proven. We are of the opinion that there is sufficient evidence in the record, from which the jury might have properly found that Worcester was evicted from the premises by Tucson contrary to the terms of the lease. Richfield Oil Co. v. Estes, 1940, 55 Ariz. 81, 98 P.2d 851; Davis v. Schweikert, 1900, 130 Cal. 143, 62 P. 411.

### Agency and Intention

Since the case must go back for retrial it is proper to call attention to certain rulings on evidence offered. We pass no opinion on the form of the questions asked but only on the law of evidence involved. Pattillo, the army officer who requested the space occupied by Worcester for use by Grand Central was not permitted to testify as to his *authority* to make such a request or as to his *agency* in behalf of the government. Objection was made and such evidence was excluded on the ground that an agent cannot testify as to the scope and extent of his authority. Although the declarations of an agent made out of court are inadmissible to prove his agency, the direct testimony of an agent in the courtroom is admissible to prove the authority under which he has acted. Daly v. Williams, 1955, 78 Ariz. 382,

280 P.2d 701, 703–704; Nygard v. Dickinson, 9 Cir., 1938, 97 F.2d 53, 57.

The trial court also excluded the officer's testimony with respect to his intention in writing the letter to Tucson, requesting the space in question. Such evidence was excluded on the ground that parol evidence cannot be permitted to contradict a written instrument. The rule excluding parol evidence which may vary a written instrument applies between parties to the instrument, but in a dispute between a party to the instrument and a stranger, either may give testimony differing from the contents thereof. Collins v. Collins, 1935, 46 Ariz. 485, 52 P.2d 1169, 1174.

The judgment is reversed and remanded to the trial court for further proceedings not inconsistent with this decision.

JAMES ALGER FEE (dissenting).

The opinion states that the District Court in this controversy sits as another court of the State of Arizona. Guaranty Trust Co. of N. Y. v. York, 326 U.S. 99, 108, 65 S.Ct. 1464, 89 L.Ed. 2079. Judge Walsh is the resident District Judge, trained at the bar of that state. He is acquainted not only with the statute and decisional law of the state, but with the nuances of practice and procedure, both administrative and judicial, of the state. If it were a question of enacting a law for the State of Arizona regarding the qualification of a foreign corporation to do business there, the rule adopted by this opinion might serve excellently. But this Court has not that power. Moreover, it appears not to be seemly for this Court to tell Judge Walsh what the Supreme Court of Arizona will hold when this question comes up to that court. We all know that the Supreme Court of the state may lay down a rule contrary to the holding of this opinion of the majority tomorrow.

"In any case, we should accord great weight to the District Court's view of New York law." Reitz v. Mealey, 314 U.S. 33, 39, 62 S.Ct. 24, 28, 86 L.Ed. 21.

" * * * the considered appraisal of the trial judge * * * of the Colorado law is entitled to great weight and should not be overruled unless it is clearly erroneous." Mitton v. Granite State Fire Ins. Co., 10 Cir., 196 F.2d 988, 992.

" * * * the reasoned opinion of a trial court upon the status of the law of the local state within which it acts should be accorded great weight by this court * * *. That rule applies especially on occasions when, in default of authoritative state legislative enactment or judicial ruling, the trial court declares its appraisal of the probable course of the state's highest court in the event of the submission to it of the controverted legal issue. * * *

" * * * ' * * * All that this court reasonably can be expected to do in reviewing cases governed by state law is to see that the determination of the trial court is not induced by a clear misconception or misapplication of the law.' " Mogis v. Lyman-Richey Sand & Gravel Corporation, 8 Cir., 189 F.2d 130, 134.

Besides, it seems the statute and the decisions give us fair warning.

The legislature of the State of Arizona had the power to impose terms upon which a foreign corporation shall be allowed to carry on business within the state. The statute enacted by the legislature provided that a foreign corporation should file a copy of its articles and do other qualifying acts "before entering upon, doing, or transacting any business", and underlined the purpose by the following section, which reads:

"No foreign corporation shall transact any business in this state until it has complied with the requirements of the preceding section, and every act done by said corporation prior thereto shall be void."

There is no reason why this plain direction should not be carried out. Worcester did business in the State of Ari-

zona from the beginning of March, 1949, until October, 1952, a period of two years. Its operation apparently involved dozens of transactions and many thousands of dollars. Even today, it has not complied with the exact command of the statute. All of its acts were void prior to compliance. Defendant has proved a general course of manufacturing household items in the State of Arizona for more than two years and did not pay its license fee. Therefore, under the case of Monaghan & Murphy Bank v. Davis, 27 Ariz. 532, 234 P. 818, quoted in the opinion, the defense was made out. The act of making the lease was one part of the extensive activity of the plaintiff within the state and constituted part of doing business by plaintiff. National Union Indemnity Co. v. Bruce Bros., 44 Ariz. 454, 38 P.2d 648, cannot be distinguished.

It is difficult to determine by what logic the first act or an intermediary act or the final act of a company, unlawfully doing business in a state, can be isolated and declared valid when the statute expressly proscribes as void "every act done by said corporation prior" to issuance of the certificate. This corporation did not perform an isolated act. It did business in defiance of the law of the state which harbored it. There is no injustice in enforcing the statute as written.